16407

## ARKWRIGHT MILLS v. CLEARWATER MFG. CO.
(61 S. E. (2d) 165)

532

*Messrs. Henderson & Salley,* of Aiken, *for Appellant,*

*Messrs. Mays, Featherstone & Bradford,* of Greenwood, *and Williams & Busbee,* of Aiken, *for Respondent,* 

*Messrs. Henderson & Salley,* of Aiken, *for Appellant,* ██

September 12, 1950.

FISHBURNE, Justice.

This appeal brings up for review a judgment of the circuit court which involves the law of bailments and its ap-

plication to the degree of care which must be exercised when the bailment is one for mutual benefit.

During the latter part of May, 1946, Arkwright Mills, which is a corporation with its principal place of business at Spartanburg, shipped to Clearwater Manufacturing Company, a corporation with its principal place of business at Clearwater, in Aiken County, approximately 60,000 yards of cotton goods known to the trade as "grey fabric", with instructions as to how the cloth should be processed and finished. This shipment duly reached the defendant at Clearwater on May 29, 1946, and on the same day was sent by the defendant to Langley, about five miles from Clearwater, and stored in a cotton warehouse there, owned by Langley Mills.

On July 3, 1946, the warehouse in which the defendant had stored plaintiff's cloth was completely destroyed by fire, and the plaintiff's goods were consumed and became a total loss.

This action was brought against the Clearwater Manufacturing Company for recovery of the value of the sixty thousand yards of grey cloth lost in the fire. The plaintiff alleged various grounds of negligence, but upon trial all of the specific allegations of negligence were eliminated from consideration except the following two:

(1) That when the fire in question was discovered, due care and diligence was not used to put it out and prevent its recurrence;

(2) That the sprinkler system in the building in question was inefficient and failed of its purpose to control the fire, and that the said sprinkler system had not been adequately inspected, tested, and maintained in a good condition to control the fire.

By its answer, the defendant admitted that the cloth had been delivered to it for processing and finishing for a consideration to be paid by the plaintiff, and that it was completely consumed by the fire which destroyed the warehouse,

on July 3, 1946. All other allegations of the complaint, including the allegations of negligence, were denied. The answer also set up for a second defense, that the destruction by fire of the goods referred to was caused by the Act of God.

The trial resulted in a verdict for the plaintiff for the full amount claimed, to wit: $19,594.34, which amount comprises the following figures: $16,197.66, the value of the cloth destroyed; $67.14. the freight prepaid on the shipment; the loss of profits by reason of the destruction of the cloth which prevented its eventual manufacture into luncheon sets, amounting to $3,329.34.

During the course of the trial, the defendant moved for a directed verdict, and later for a directed verdict *non obstante veredicto*. Both of these motions were refused.

This appeal by the defendant raises several questions for our consideration, which are based upon the court's refusal of the motions above referred to, and upon errors alleged to have been committed by the trial court at various stages of the trial.

In considering the issues raised by the appeal, we first turn to that group of exceptions which charges error of the trial court in failing to direct a verdict for the defendant. Before discussing the evidence, however, for the purpose of determining whether a reasonable inference could be drawn therefrom that the appellant was guilty of a lack of ordinary care in protecting the property of the respondent which constituted the proximate cause of its loss by fire, we think it would be well to consider a legal issue presented by the appellant which primarily relates to the burden of proof in bailment cases.

In one of our most recent cases on this subject, the rule as to what constitutes a *prima facie* case is thus stated: "From a study of the decided cases in this State, it would appear that our Court has recognized that certain presumptions may arise in bailment cases, especially

as to warehousemen, which overlap and shadow the oft repeated statement found in negligence cases, that the doctrine of *res ipsa loquitur* does not prevail in this State. In other words, in warehouse bailments, when the bailor shows that the bailee has not returned the property, the subject of the bailment, or that the property has been lost by theft or fire, or that it has been returned in a damaged condition, such bailor has made out a *prima facie* case, and the duty is then shifted to the bailee to show that he has used ordinary care in the storage and safekeeping of the property. From these facts, coupled with any testimony on the subject the bailor may introduce, it is for the jury to say whether the bailee has been negligent, that is, failed to use ordinary care. Of course if upon all the testimony in the case the only reasonable inference that can be drawn therefrom is that the bailee used due care, it would then be the duty of the trial judge to direct a verdict in the bailee's favor." *Albergotti v. Dixie Produce Co.,* 202 S. C. 357, 25 S. E. (2d) 156, 158. The case of *Fleischman, Morris & Co. v. Southern Railway Co.,* 76 S. C. 237, 56 S. E. 974, 9 L. R. A., N. S. 519, announces the same doctrine.

Because of the manifest difficulty encountered in so many bailment cases, the law has come to be well recognized that in those instances of bailment, where the bailee has the sole, actual and exclusive physical possession of the goods, the bailee is presumed to be negligent if, upon the disappearance of the goods, he cannot explain their loss. This rule, as is pointed out in the cases, is one of necessity, because where the bailee has the exclusive possession of the property, it follows that he must also have the exclusive means of showing what became of it.

As we read appellant's brief, the foregoing statement of the rule is admitted, but it is contended that under the circumstances of this case, this rule does not apply, because where the bailor either alleges, or presents testimony tending to prove, specific acts of negligence on the part of the bailee, that then the bailor assumes the duty of going for-

ward with the testimony after he has proved the bailment, and the failure to return the goods. It is true that the respondent in its complaint alleged various acts of negligence, but upon trial, after offering testimony showing delivery of the goods to the appellant and its failure to return them, counsel for respondent then requested a ruling from the court as to whether respondent had the burden of going forward and proving acts of negligence alleged in the complaint. Appellant argued then, as it does now, that respondent having pleaded specific acts of negligence should be required to go forward and prove them. In other words, where negligence is alleged, the duty does not shift to appellant to exonerate itself from negligence.

The court ruled adversely to the contention of the appellant. The cases from many jurisdictions are in conflict on this question, but it is settled contrary to the contention of the appellant in this state by the case of *Prescott v. Southern Railway Co.,* 99 S. C. 422, 83 S. E. 781. The court held that although the complaint in an action against a warehouseman for loss of goods, did not allege negligence generally, but stated the particulars of the negligence, this did not prevent the applicability of the presumption of negligence. In such cases the plaintiff need not prove any of the acts of negligence specified, but upon proof of delivery and loss, the warehouseman had the duty of showing due care. We granted appellant's petition to attack the decision in the *Prescott case,* but upon a careful consideration thereof, we adhere to the rule therein announced.

The respondent did not assume the burden of proving the allegations of negligence. Following the ruling of the trial court, appellant proceeded to offer its evidence in an effort to absolve itself from the *prima facie* presumption of negligence.

Among the cases cited and relied upon by appellant in support of its contention that since the respondent alleged negligence, it had the burden of proving such allegation even though such allegation was unnecessary, is the case of *Bar-*

*ret v. Ivison,* 248 Ky. 243, 57 S. W. (2d) 1005, 1008. In that case the court held that if appellant had merely pleaded, and confined his evidence to, the delivery of the boat in good condition and appellee's failure to return it, a different question would have been presented. The court stated: "However, that is not the case. He pleaded that the boat and its contents were totally destroyed by reason of appellee's gross negligence. In the circumstances, not only was the burden on appellant to show negligence * * *, but he undertook the burden, introduced numerous witnesses, and fully developed the case. In short, he did for appellee all that appellee could have done for himself without adding his own testimony. Therefore he was not entitled to go to the jury if the evidence as to how, when, and under what circumstances the fire occurred was not sufficient to show negligence on the part of appellee. *Stone v. Case,* 34 Okl. 5, 124 P. 960, 43 L. R. A., N. S. 1168."

It is interesting to note what the Kentucky court in a later case had to say with reference to *Barret v. Ivison, supra.* In *Threlkeld v. Breaux Ballard,* 296 Ky. 344, 177 S. W. (2d) 157, 160, 151 A. L. R. 708, which is in line with our case of *Prescott v. Southern Ry. Co., supra,* the court made this comment:

"It is to be noticed that the court (in *Barret v. Ivison, supra*), indicated that it was unnecessary for the bailor to plead negligence and to assume the burden of proving it, but since he pleaded that his property was destroyed by reason of defendant's negligence and undertook the burden of proving negligence and developed the case for the defendant on that issue, he was not entitled to go to the jury if the evidence was not sufficient to show negligence on the part of the defendant. It is not clear whether or not a different conclusion might have been reached had not the plaintiff both alleged and assumed the burden of proving negligence, but had simply ignored that allegation and rested his case after proving that the boat was delivered to the de-

fendant in good condition and was destroyed or returned in a damaged condition, as was done in the case at bar.

"If it be conceded, however, that that opinion purports to hold that it devolved on plaintiff to prove negligence simply because of such allegation, such would be contrary to and in direct conflict with the other domestic cases, *supra,* which we think clearly support plaintiff's contention that once she had proved that she delivered her automobile to defendant in good condition and it was returned in a damaged condition she thereby established a *prima facie* case of negligence as alleged in her petition. It is the settled rule of law that once a party establishes a *prima facie* case, judgment will go in his favor unless the opposite party produces evidence sufficient to overcome the *prima facie* presumption."

We now come to a consideration of the evidence to determine whether or not the lower court erred in overruling the motions made by appellant for a directed verdict. It is contended by appellant that the evidence is susceptible of but one reasonable inference, and that is, that due care was exercised by it in the storage of the cloth.

We repeat a well established rule in this state, which is, that in passing upon a motion by the defendant for a directed verdict, the testimony must be viewed in the light most favorable to the plaintiff, and that if more than one reasonable inference can be drawn therefrom, or if the inferences to be deduced from the testimony are in doubt, the case should be submitted to the jury. *Lynch v. Pee Dee Express,* 204 S. C. 537, 30 S. E. (2d) 449; *Cox v. McGraham,* 211 S. C. 378, 45 S. E. (2d) 595.

The warehouse in which the respondent's grey cloth was destroyed by fire was formerly operated as a cotton mill, but some years ago it was converted into a warehouse, and is owned by Langley Mills. There were three floors in the building,—the first and second floors being rented to the appellant for storage purposes. Respondent's cloth, along with other property, was placed on the second floor. On the third

or top floor, where the fire originated, there was stored approximately one thousand bales of cotton. The record shows that the value of the cotton, cloth, and other articles at the time of the fire in this Langley warehouse was $1,641,837-.82. All of this property was destroyed in the fire which occurred on July 3, 1946.

Three watchmen were employed on separate shifts, to make their hourly rounds throughout the warehouse. Appellant's witness, B. W. Meyers, stated that he was one of the watchmen and that on the night of the fire, which was the day before the Fourth of July, he was on vacation. Quoting him, "The other watchmen were Mr. Timmons, Humphries, and old man Best was a spare man. He was working for old man Timmons that night." As stated, Mr. Best was on duty the night of the fire, and it appears from other testimony that "he had done very little watching." Mr. Best died before the trial of this case. As to what happened that night during the inspection rounds made by him, we must rely principally on the testimony of appellant's witness, C. H. Holley.

Mr. Holley was a loom fixer in the Langley plant at the time of the fire. He said that on the night of July 3rd he was in the office occupied by the night watchman, about seven o'clock p. m., at which time there was a very severe storm of lightning, thunder and rain. That Mr. Best returned from his seven o'clock inspection of the warehouse, and told him that the lightning was bad and seemed "like it struck around here somewhere." But neither knew where the lightning had struck. At this time it was raining heavily. At the eight o'clock round, according to Holley, Best requested him to go with him. They reached the third floor where the cotton was stacked bale on bale, with aisles between, and they smelled smoke. They went further into the room through the four-foot alley between the bales, and near a pilot light suspended from a cord they saw smoke reflected in the light, coming out of a bale of cotton. Best pulled what cotton he could from the burning bale, put it on the floor,

and getting a 10-quart bucket of water which was attached to a post, wet the cotton on the floor with about half of it. The bale of cotton which had been standing on end was laid flat on the floor before the burned cotton was taken from it. Mr. Best splashed what remained of the water from the 10-quart bucket with his hands, into the hole burned in the bale.

The three floors in the warehouse measured 80 feet wide and 113 feet long. Two drop lights with 60-watt bulbs furnished the only illumination in the room where the cotton was stored.

Cross examined, Holley testified that when the fire was discovered, the bale of cotton in question was standing on end, that smoke was coming out of the top; and that this particular bale was way down the alley. He stated that he was not on duty, and that he did not look at any other bales to discover smoke. Holley said that he had never before seen a bale of cotton on fire; that he was not looking for a blaze in any other bale of cotton. And when asked,—"Did you look to see what caused it?" replied, "We did not look." By this answer he evidently referred to himself and Best. He expressed the belief that when he and Best left the third floor the fire was out; and before leaving, Mr. Best punched his time clock with a key attached to one of the posts in the room. He could not recall that Mr. Best checked the sprinkler or the valve or any other fire protection to see that everything of that nature was working all right.

When the time came to make the nine o'clock round of inspection, Holley, according to his testimony, remained in the office and Mr. Best went alone. He told Holley that he was going a little early, about ten minutes before nine o'clock to see if he could find any fire on the third floor. When Best returned he told Holley,—"I still smell smoke; I could not find fire." He said, "Probably it hasn't drifted out yet."

On the ten o'clock round, Best again left a little early, and, quoting Holley, "He made some kind of a remark of

investigating the fire again." On this round he once more went alone, but before he had time to return, Holley stepped out into the warehouse yard, and looking toward the warehouse, discovered that fire was on the third floor. Holley then proceeded to the bell tower and started ringing the bell to give the fire alarm. He and Mr. Best got to the bell tower about the same time.

To summarize the facts as they were presented to the court, we find an elderly watchman who was a substitute employee, and who, it may reasonably be inferred, had had very little experience in connection with his duties, guarding a warehouse containing stored goods valued at more than a million and a half dollars. He discovers a fire at eight o'clock in one bale of cotton on the third floor where approximately a thousand bales were stored. After using a 10-quart bucket of water to quench this fire, he leaves the bale in the room with the other cotton and continues his round of inspection. He does not check for any other burning bales, despite the fact that this large room was poorly illuminated, and that bales of cotton were stacked on top of each other on this third floor. It may reasonably be inferred, as shown by the evidence, that he knew that a cotton fire is a dangerous and treacherous thing, and as he stated, according to Holley, "cotton is bad about catching back up." Disregarding this, he made no further investigation until shortly before nine o'clock, when he left a little early to make his nine o'clock round. He went alone and when he returned he told Holley that he still smelled smoke on the third floor. One hour later, when he was making his ten o'clock round, the fire was discovered in the same room, and it resulted in the complete destruction of the building and of everything in it.

If it is reasonably clear,—and it is,—that when the fire was discovered in the bale in question, at eight o'clock, Mr. Best made no examination to determine if any other bale was on fire, then we might draw a like conclusion as to what occurred when he smelled smoke on his nine o'clock inspec-

tion. It may reasonably be inferred that if he made an examination to see where the fire was when he smelled smoke, such examination must have been, in that vast room, purely superficial. He made no report of it to his superior.

We think the evidence which we have stated would not have justified the trial court in directing a verdict as a matter of law in favor of the defendant. Under this testimony it was a question for the jury to determine whether appellant had exercised due care in discharging its duty as a bailee of respondent's goods, in putting out the fire and preventing its recurrence.

Appellant contends that the evidence warrants the inference that this fire which we have discussed, was extinguished and went out of existence, and that there was another fire ignited by lightning in the same room at ten o'clock, or shortly before, which caused the disaster. It was at ten o'clock when the fire was discovered on the third floor and the fire bell was rung. It is argued that the two fires were separate and distinct and in no way connected with each other. This argument is based on the theory that the two fires,—if there were two,—were in different parts of the room, about 35 or 40 feet apart. This contention is largely based on testimony of respondent's witness, Mr. Strong, who reached the scene immediately after the fire alarm was given. He said that he met Mr. Best and they went back up to the third floor together, and that "there was one side burning considerable close to the window." Mr. Strong testified that he had never been in that warehouse before.

Respondent's witness, Humphries, who was an employee of appellant, and one of the night watchmen, testified that he had had some experience with cotton fires, and that they are "about as bad as a man has anything to do with." Referring to baled cotton, he stated, "It is packed so tight the water can't run in it, you can pour water on it, I don't think it (the water) will take effect quick, you might go back the next day and find the bale burning the next day, a bale of cotton is hard to put out."

One of appellant's witnesses testified: "You might think fire in a bale of cotton is out, but in an hour or so it will blaze up again." We think it may be stated as a matter of general knowledge that fire in baled cotton is difficult to control and hard to put out.

Appellant's expert testimony tended to show that during the two or three hours continuance of this storm, from seven o'clock to ten o'clock, the atmosphere could have become surcharged with electricity; that a stroke of lightning could have started what is referred to as the second fire, which was discovered burning at ten o'clock, and that when this occurred there was an upsurge of electricity resulting in a flash fire, which quickly had the whole room, stored with cotton, ablaze. However, appellant's witness, Meyers, one of the night watchmen, after describing the storm, stated on direct examination: "It was about an average lightning storm, I guess."

From the evidence in this case, it was for the jury to determine whether the first fire discovered was ever extinguished, and whether or not what is described as the first fire and the second fire were not one and the same. Certainly the evidence does not warrant the inference, as a matter of law, that there was what is called a flash fire. The testimony of Willis Strong was to the effect that when he and Mr. Best went up to the third floor, at ten o'clock or shortly thereafter, one side of the room was burning, close to the window; and no inference can be drawn from his testimony that the whole room was ablaze. Nor does the testimony disclose how long that fire had been burning. We think it was a question for the jury to decide, on the whole evidence, whether or not what appellant calls the second fire was not a recurrence and continuation of the first, which Mr. Best had discovered at eight o'clock. It was likewise for the jury to say whether the alleged second fire was separate and distinct, and in no way connected with the first fire. We might also add that it was a question for the jury, whether or not, in the exercise of due care, the investigation by Mr.

Best at eight o'clock, or even at nine o'clock, would not have revealed at that time this alleged second fire in its incipiency.

The remaining issue of negligence submitted to the jury, has to do with the sprinkler system. The allegation as to this charges that the sprinkler system installed in the warehouse in question was inefficient and failed of its purpose to check the fire. And that the sprinkler system had not been adequately inspected, tested and maintained in a good condition to control the fire.

Appellant's first position on this question is that the exercise of ordinary care on its part, as bailee, did not require the presence of a sprinkler system in the Langley warehouse, and that the trial judge should have so held as a matter of law and not submitted this issue to the jury. To sustain this contention, appellant relies upon the cases of *Kelley v. Capital City Motors,* 204 S. C. 304, 28 S. E. (2d) 836, and *Scott Williams & Co. v. Crews,* 2 S. C. 522.

The rule governing the duty of the warehouseman to the depositor of goods in his care is that he should exercise due care and reasonable precaution to protect and preserve the property placed in his custody,—that is, such care as an ordinarily prudent person engaged in that business is in the habit of exercising toward property entrusted to him for safe-keeping. The question whether a warehouseman has exercised due care with regard to stored goods is to be determined with reference to all the circumstances of the particular case. This is a comprehensive statement of the rule as given in a long list of decisions from this and other jurisdictions. In addition to the cases of *Kelley v. Capital City Motors* and *Scott Williams & Co. v. Crews, supra,* we cite *McCord v. Atlantic Coast Line R. R.,* 76 S. C. 469, 57 S. E. 477; *Fleischman, Morris & Co. v. Southern Ry.,* 76 S. C. 237, 56 S. E. 974, 9 L. R. A., N. S., 519; *Wardlaw v. South Carolina R. Co.,* 11 Rich. 337.

In *Scott Williams & Co. v. Crews, supra,* decided in 1871, the court held that in a bailment for mutual benefit, the bailee

is required only to exercise ordinary diligence, and diligence being a term so relatively significant, the circumstances surrounding each particular case must be considered. The court further held that the standard of care is necessarily variable with respect to the facts, although it may be uniform with respect to the principle.

The same principle was announced in the case of *Kelley v. Capital City Motors, supra.* The court in the *Kelley case,* after a full discussion of the principles of law applicable to bailment, stated, with reference to the employment of night watchmen, the installation of a sprinkler system, or a fire extinguishing apparatus: "While these precautions are admirable, and while one who employs them is to be commended for his care and caution, *and while the circumstances surrounding some bailments for mutual benefit might well require their exercise and employment by a bailee,* we hesitate to hold that every person who operates an automobile sales room and repair garage must either employ a night watchman or else be held guilty of negligence;—or must either install a sprinkler system or fire extinguishing apparatus or else be held to be negligent;—or must either have all three—night watchman, sprinkler system and fire extinguishing apparatus—or else be held to be negligent." (Emphasis added.) [204 S. C. 304, 28 S. E. (2d) 839.]

In other words, the facts of each case must determine the issue.

In our opinion, under the settled principles of law, it was for the jury to determine, on all the evidence before them, whether or not ordinary care required a sprinkler system.

What would a reasonably prudent warehouseman, under the circumstances shown here, have done in the exercise of due care? Witnesses placed on the stand by appellant testified that they could not remember offhand any cotton mill warehouse without a sprinkler system. Appellant's witness Lowery stated: "That is one difference between cotton mill

warehouses and the general run of state warehouses. A sprinkler system in most cases is supposed to control a fire which starts under the sprinkler." And he went on to testify that the general average of warehouses in the state warehouse system belongs to a different classification from a cotton mill warehouse.

We have here a warehouse in which a sprinkler system had been installed. It contained a thousand bales of cotton and other inflammable goods, stored and stacked on the third floor where the fire originated. A similar fire hazard prevailed on the second floor. The value of the stored goods exceeded a million and a half dollars.

The court committed no error in submitting to the jury the question whether the failure to install and maintain a sprinkler system would have constituted negligence, or a failure to exercise due care under the circumstances, especially when the testimony of its own witnesses showed that all other cotton storage warehouses maintained a sprinkler system.

Another position taken by appellant is that it exercised at least ordinary care in its inspection, supervision and maintenance of the sprinkler system. It is true that many witnesses were offered by appellant on this issue,—insurance inspectors and others,—but we think under the evidence, the trial judge was correct in having the jury pass on it. The question before the court was not to determine where the preponderance of the evidence lay, nor to pass upon the credibility of the witnesses. These matters fell within the province of the jury. It was for the court to determine whether there was any substantial evidence on which the jury could find that the inspection and maintenance of the sprinkler system was inadequate.

By reverting to the evidence, it appears that the valve which controlled the flow of water to the sprinkler system in this building was attached to a post on the first floor, ceiling high. Following the fire, this valve was recovered from

the debris, and was found to be closed. Appellant argued that it could have been closed as a result of its fall to the floor, or fused by the heat. Or, as some of the witnesses testified, it might have been closed prior to the fire by mischievous persons, or mysteriously closed, for which no reasonable explanation could be given.

Certainly, the location of the valve, ceiling high, did not render it easily accessible for mischievous persons to tamper with it. Respondent's witness, Strong, testified that when he reached the third floor with Mr. Best, the watchman, there was sufficient fire in the room to create enough heat to start the automatic operation of the sprinkler system, but he said the sprinkler system was not working. He and Mr. Best then came down to the first floor where this control valve was located. He raised a ladder and held it while Mr. Best climbed to the valve and struggled with the wheel to open it. He quotes Mr. Best as saying, "The damn valve is stuck."

Humphries, a witness for the respondent, and an employee of appellant, in accordance with his duty, applied the drain test connected with the valve a few days before the fire and discovered that the water did not come out as it would have done had the valve been open. He says that he reported this to his superior, Bennie Meyers.

As stated, much evidence was introduced to the contrary to show the care exercised by appellant in the maintenance of the sprinkler system, but considering all of the testimony, in our opinion, it was a question for the jury as to whether or not due care was exercised by appellant.

It was likewise an issue for the jury to determine whether this valve became closed during the fire, or in the fall that it sustained, from the ceiling to the first floor. Appellant produced the valve at the trial. It was closely examined by the jurors, who had the benefit of a great deal of evidence thereabout. In our opinion, this evidence did not present a question of law, but presented a question of fact to be passed upon by the jury.

Appellant next contends that no reasonable inference can be drawn from the whole of the testimony, that the adequate operation of the sprinkler system would have resulted in controlling the fire which destroyed the building and its contents. It is argued that to submit this question to the jury constituted reversible error, in that it sent them into the realm of conjecture and surmise.

On this issue, one of appellant's expert witnesses, Mr. J. V. Williams, an inspector for the Grinnell System of Sprinklers, was asked on direct examination, whether or not if a fire gains headway, a sprinkler system is effectual always to stop or control the fire. He replied: "A sprinkler system in the insurance records, plus the records our company keeps, shows that 90 per cent. of fires are controlled by the sprinkler system, but as a rule less than six to ten heads will operate to control that fire. The other 10 per cent. are cases in which the sprinkler system has not controlled."

In order to place the fire in the Langley warehouse in the 10 per cent. category, the appellant offered testimony tending to show that the fire on the third floor was caused by a flash of lightning, an Act of God, which resulted in what is termed a flash fire; and that this fire got beyond the control of the sprinkler system before the sprinkler system could become effective. So far as the record shows, the only person other than Mr. Best, who actually entered the third floor and carefully inspected this fire in what might be called its early stage, was the witness, Willie Strong, who testified that the fire was burning toward the windows, and not over the entire room. However, no one could definitely know how long it had been burning prior to this time. He further stated that no water was coming from the sprinkler heads, although sufficient heat had been generated in that room from the fire to cause their automatic operation.

Appellant's witness, Allen, testified on this point. He stated that he lived three blocks from the warehouse; that soon after the fire alarm was sounded he reached the scene,

and someone asked him to call the fire department. He said he ran back to Mr. Roach's house who had a telephone, and called the Augusta Fire Department. He testified that he made the telephone call about 30 minutes after the bell rang, and that the Augusta Fire Department reached the scene of the fire about 30 minutes after the telephone summons. He further said that the Augusta Fire Department was the first fire department to arrive, and by that time the third floor was on fire from one end to the other. But it should be observed that at that time the fire had been burning for an hour or more.

In our opinion, in view of the evidence on this point, it was for the jury to say whether the sprinkler system, if it had been in working condition, might have controlled the fire which destroyed the warehouse and contents.

The rule announced and followed in this jurisdiction ■ is that, even if the loss of the stored goods is due to an Act of God, if the negligence of the warehouse-man commingles with and operates as a contributive element, proximate to the injury, the warehouseman is liable. *Fleischman, Morris & Co. v. Southern R. Co.,* 76 S. C. 237, 56 S. E. 974, 9 L. R. A., N. S., 519.

We next consider certain exceptions charging error in the instructions given to the jury.

In charging the jury the various degrees of care,—slight, ordinary, and the highest degree which a bailee is required to exercise, depending upon the nature of the bailment, the trial judge gave this instruction: "The test is not what would have been done by a person or company of the highest degree, *the perfect person or perfect company, the person or company that never makes any mistakes,* nor is the test what would have been done under the same circumstances by the careless or indifferent person or company, but what would have been done under the same circumstances by a person or company of ordinary care, ordinary judgment and ordinary prudence in the protection of his or its own property."

It is argued by appellant that the jury could and must have concluded, from the above italicized words, that if the conduct of the appellant as bailee was in any degree less than perfect, then it was liable.

After carefully defining the standards of care and negligence, the trial judge clearly and without ambiguity charged the jury as to the degree of care which appellant in this case should have observed and followed. He told the jury: "The duty laid down by the law and placed upon the bailee in charge of another's property, placed upon the Clearwater Company in this case, was the exercise of due care, the exercise of ordinary care and due care, (which) says the law, is that degree of care which would be exercised under the same circumstances under investigation by a person or company of ordinary care."

Following the foregoing excerpt, the trial judge gave this instruction to the jury: "The rule is that the defendant, Clearwater Manufacturing Company, would be liable to the plaintiff, Arkwright Mills, only if you find that the defendant has failed to exercise mere ordinary care, not extraordinary care, in caring for and preserving the goods in question, and further that such lack of ordinary care actually was a proximate cause of the loss of the goods. Ordinary care is defined by the Supreme Court of South Carolina, and I so charge you, to be 'that degree of care which a man of ordinary prudence and care would exercise in the protection of his own property.'"

In fact, this sound principle of law is repeated more than twice. We fail to perceive how the jury could possibly have been misled or confused to the prejudice of the appellant.

Error is assigned because the following instruction was given: "I charge you if there was an Act of God such as a lightning stroke to start a fire, and if there was in addition to that due care on the part of the Bailee and the goods were destroyed in spite of the due care, ordinary care

on the part of the bailee, the bailee would not be liable, but I charge you if an Act of God commenced the fire and the bailee was negligent in trying to control the fire, put it out, in any way, shape or form if that negligence was the direct cause of the destruction of the property, in addition to the Act of God, in such case the bailee would be liable to the bailor."

Appellant contends that by including in the charge the words, "in any way, shape or form," the charge improperly and unduly broadened the inquiry of the jury, and permitted them to consider any possible acts of negligence on appellant's part in trying to control the fire, whether the same were embodied in the two specific issues of negligence submitted to the jury or not. And that the use of the challenged expression increased the measure of the duty of the bailee to exercise only ordinary care.

Considering the charge as a whole, we think appellant suffered no prejudice.

After instructing the jury this principle, practically in the same words used by the court in the case of *Slater v. South Carolina Ry. Co.,* 29 S. C. 96, 6 S. E. 936, the court charged as follows: "To apply this to the present case you are charged that if you find from the preponderance of the evidence that the destruction by fire of the goods referred to in the complaint was brought about by an act of God, then the defendant's plea to that effect is made out and your verdict must be in favor of the defendant unless you also find not only that there has been negligence on the part of the defendant but further that if such negligence had not been present the destruction of the goods by fire would not have happened. You will observe that for any negligence upon the part of the defendant to operate to defeat its plea of the act of God, it must be such that the destruction of the goods by fire would not have occurred but for the presence of such negligence. In other words, the negligence on the part of the defendant which would have the effect stated

must be a proximate cause of the destruction by fire of the goods in question."

In a long and on the whole, an admirably correct charge to the jury, such as was given in the case at bar, the fine distinction pointed out in these exceptions is in our opinion hypercritical. To constitute reversible error, not only must the error be shown, but it must also appear that the error was prejudicial. In our opinion, the appellant suffered no prejudice.

The trial judge instructed the jury that it should find a verdict for assured profits in the sum of $3,329.34,—"if, upon all those rules of law applicable to the facts as determined by you, you come to the conclusion that the plaintiff, Arkwright Mills, is entitled to a verdict against the Clearwater Company." The jury having found for the respondent, the foregoing amount was included in the verdict.

Appellant assigns error, among other exceptions, on the ground that profits which are dependent on or arise out of a collateral contract to which the alleged wrongdoer is not a party, and of which he has no specific notice or knowledge, are not allowed.

In the case at bar, the evidence tends to show that Cohn-Hall-Marx Company was the New York agent for Clearwater Manufacturing Company. The claimed profits, under consideration, arose out of a collateral agreement or contract between Joshua L. Bailey & Company, selling agent for Arkwright Mills, and Bernhard-Ullman and Company; and the record tends to show that Mr. Bonsal, vice-president of Bailey & Company, admitted that no notice of the contract was ever given to the Clearwater Manufacturing Company. Respondent argues, however, that Cohn-Hall-Marx knew that the 60,000 yards of grey cloth was eventually to be made into luncheon sets and sold to Bernhard-Ullman and Company; and that Cohn-Hall-Marx Company employed the appellant to process and finish the cloth, after which it was to be shipped to the Winston Company of Winston-

Salem, North Carolina, to be cut and manufactured into luncheon sets, and then sent to Bernhard-Ullman in New York.

Respondent contends that notice relative to the contemplated profits should be imputed to Clearwater Manufacturing Company because its affiliate corporation in New York City knew that the cloth was eventually to be made into luncheon sets and sold to Bernhard-Ullman and Company. The general law is well stated in 15 Am. Jur., Sec. 154, page 568:

"Loss of profits growing out of an existing collateral or subordinate agreement may be recovered where they were within the contemplation of the parties when the original contract was made, but, as in other cases of special damage, the defendant must have had notice of the existence of such collateral contract at that time. It is not necessary, however, that the collateral contract be mentioned in the original contract where the defendant has notice of it from other sources or that the defendant have exact knowledge of its terms or details. * * *

"Profits are usually considered too remote, however, which are not the immediate fruits of the principal contract but are dependent on collateral engagements and enterprises, not brought to the notice of the contracting parties, and not, therefore, brought within their contemplation or that of the law * * *."

We have read with great care the testimony bearing upon this subject, and it is our opinion that there is no evidence from which a reasonable inference may be drawn under the applicable law, that Cohn-Hall-Marx Company had any definite knowledge of the terms or details of the contract entered into between Arkwright Mills and Bernhard-Ullman and Company. Although Cohn-Hall-Marx Company, appellant's affiliated corporation, knew that the cloth was to be finally made into luncheon sets after it passed out of the possession of Clearwater Manufacturing Company, it knew nothing except from conjecture or surmise what profit, if

any, the Arkwright Mills might make from the transaction. The testimony on this question is entirely speculative, and is based on too many contingencies to justify the inclusion of profits in the verdict.

In our opinion, respondent failed to make out its case on the issue of profits. The evidence does not sustain the contention that the appellant had sufficient notice of the elements of the collateral contract entered into between the respondent and a third party; and the claimed amount of profits, to wit, $3,329.34, should be deducted from the amount of the verdict.

This subject has been given full discussion and analysis in the following cases: *Fay & Egan Co. v. Mims,* 151 S. C. 484, 149 S. E. 246; *McMeekin v. Southern R. Co.,* 82 S. C. 468, 64 S. E. 413; *Martin v. Seaboard Airline Ry.,* 70 S. C. 8, 48 S. E. 616; *Horres v. Berkeley Chemical Co.,* 57 S. C. 189, 35 S. E. 500, 52 L. R. A. 36.

It is accordingly ordered that the judgment of the circuit court be reversed and a new trial granted, unless the plaintiff shall within 10 days after the filing of the remittitur in the circuit court, remit on the judgment record the sum of $3,-329.34; and that upon the entry of such remission the judgment of the circuit court stand affirmed. *Currie v. Davis,* 130 S. C. 408, 126 S. E. 119.

STUKES, TAYLOR and OXNER, JJ., and LIDE, Acting Associate Justice, concur.

BAKER, C. J., not participating.