574 S.E.2d 215

Yolanda **BURROUGHS**, individually, and as Personal Representative of the Estate of James Burroughs, deceased, Respondent,

v.

John W. **WORSHAM**, M.D.; Terrell T. Leeke, M.D.; and Fairview Family Practice, Defendants,

of whom John W. Worsham, M.D. and Fairview Family Practice are Appellants.

No. 3576.

Court of Appeals of South Carolina.

Heard Nov. 5, 2002.

Decided Dec. 9, 2002.

384

John Hamilton Smith, of Charleston; Ruskin C. Foster and John C. Bradley, Jr., both of Columbia, for Appellants.

Susan C. Rosen and Richard S. Rosen, both of Charleston; Jeffrey J. Kroll and Isobel S. Thomas, both of Chicago, for Respondent.

ANDERSON, J.

Yolanda Burroughs, individually and as personal representative for James Burroughs' (Burroughs) estate, brought suit against Dr. John W. Worsham and Fairview Family Practice (collectively referred to as "Appellants") for medical malpractice. She alleged causes of action for wrongful death, survival, and loss of consortium. The jury awarded $3,500,000 each for the survival and wrongful death actions. The jury determined the decedent and Appellants were each fifty percent at fault. The jury found for Appellants on the loss of consortium claim. We affirm.

## FACTS/PROCEDURAL BACKGROUND

Burroughs received a bachelor's degree, master's degree, and doctorate in theology. While serving as a missionary in Mexico, Burroughs met Yolanda, whom he married in 1984. They later had two children. After marrying, the couple moved back to the United States, and eventually settled in Greenville to be close to Burroughs' ill father.

Burroughs began working for the Hyatt Corporation as a night audit supervisor for $6.50 an hour. He was subsequently promoted to income auditor, to paymaster, to general cashier, to systems administrator, to systems specialist, and then to systems analyst. Burroughs was promoted in 1996 to

Management Information Systems Manager. Finally, in May 1997, he was transferred to the corporate headquarters in Chicago, where he became an analyst on special programs and applications making $38,000.00 per year.

While residing in Greenville, Burroughs was a patient at Fairview Family Practice, which was owned by Dr. Worsham and Dr. Terrell T. Leeke. In 1990, Burroughs went to Dr. Leeke, who referred him to a gastroenterologist. Burroughs was diagnosed with a bleeding ulcer. Burroughs' first visit to Dr. Worsham was in 1992 for treatment of poison ivy. In 1993, Burroughs went back to the gastroenterologist and was diagnosed as having a propensity for ulcers and suffering from gastritis and duodenitis.

Burroughs was next seen by Dr. Worsham on April 12, 1995, to determine the cause of his lower abdominal pain. A hemoglobin test was performed and it indicated that Burroughs had a low hemoglobin count. Dr. Worsham prescribed ulcer medication, but provided no further treatment nor did he follow up on the hemoglobin count.

In August 1995, Burroughs returned to Fairview with abdominal pain. He was examined by Dr. Worsham and was diagnosed with acute bacterial prostatitis, for which an antibiotic was prescribed. Burroughs failed to follow-up for reexamination.

Dr. Worsham gave Burroughs a physical examination in February 1996. Burroughs continued having abdominal pain. Dr. Worsham informed Burroughs that he did not have any significant medical problems, but was anemic. Burroughs was prescribed iron and Citrucel. Dr. Worsham instructed Burroughs to return for a complete blood count in four weeks. According to Dr. Worsham, Burroughs did not go back for the four-week follow-up appointment.

Five months later, Burroughs returned with severe abdominal pain. Dr. Worsham did another blood test and again diagnosed Burroughs as having acute bacterial prostatitis. In his medical note, Dr. Worsham wrote: "[Burroughs] has a deep seeded [sic] fear of either prostate or stomach cancer . . . ." Dr. Worsham additionally diagnosed Burroughs with "cancer phobia." Dr. Worsham directed Burroughs to call the next day for his lab results and to make an appointment to see

Dr. Worsham in two weeks. Neither Dr. Worsham nor Burroughs followed up on the lab results.

Burroughs subsequently saw Dr. Worsham in October 1996. He complained of right side abdominal pain, dizziness, and weakness. Dr. Worsham believed Burroughs had a kidney stone and tests were performed which came back normal. Burroughs returned the following day with continued pain. Dr. Worsham felt a bulge in Burroughs' lower right abdomen. He concluded Burroughs had an incisional hernia over an old appendectomy scar.

Burroughs was referred to Dr. Joseph C. McAlhany, a general surgeon, for evaluation of his condition. Dr. McAlhany noted the pain was "just some strain secondary to the previous appendectomy scar." He prescribed anti-inflammatory agents and heat. Further, he instructed Burroughs to return for a recheck in two to three weeks. Burroughs failed to show up for the follow-up office appointment with Dr. McAlhany.

In April 1997, Burroughs returned to Fairview with abdominal pain. Because Dr. Worsham was no longer with the practice, Dr. Leeke treated Burroughs. Dr. Leeke determined Burroughs was suffering from abdominal pain and chronic anemia. He prescribed Burroughs' usual ulcer medications.

Approximately two weeks later, Burroughs moved to Chicago for his promotion with Hyatt Hotels Corporation. On November 3, 1997, Burroughs sought treatment in the emergency room of Edward Hospital for severe lower abdominal pain, dizziness, and diarrhea. He was admitted to the hospital. A CT scan showed a mass in the lower abdomen. Burroughs was diagnosed as having colon cancer.

Several surgeries were performed in an attempt to remove much of the cancer. However, by the time it was diagnosed, the cancer had spread throughout the abdomen. Burroughs' cancer was incurable. He and his family returned to Ware Shoals, where Burroughs received treatment and hospice care. Burroughs died in May 1999.

Yolanda originally brought this action against Fairview, Dr. Worsham, and Dr. Leeke. Dr. Leeke was dismissed by a

directed verdict, and the initial trial ended in a mistrial. The case was retried against Appellants. The jury determined Appellants and Burroughs were each fifty percent liable. The jury awarded $3,500,000 on both the survival and wrongful death actions. The jury found for Appellants on the loss of consortium claim. Appellants' motions for judgment notwithstanding the verdict and a new trial absolute were denied.

## ISSUES

I. Did the trial judge err in admitting Dr. Bart Green's testimony over Worsham's objection because South Carolina does not recognize the "loss of chance of survival" doctrine?

II. Did the trial court err in admitting testimony from Burroughs' employer regarding possible future promotions and salary ranges, and in allowing testimony by an economist, who relied on these figures for calculation of future damages?

III. Did the trial court err in refusing to allow Worsham, as referring doctor, to testify as to what he expected Dr. McAlhany to do in evaluating and diagnosing Burroughs' condition pursuant to the referral?

IV. Did the trial court err in refusing to permit Worsham to testify that his review of Dr. McAlhany's chart showed no entry indicating Burroughs returned for a follow-up visit?

V. Did the trial court err in failing to properly charge the jury regarding the standard of care to which Worsham should be held?

VI. Were the jury verdicts in this case inconsistent, where the jury found damages for wrongful death but no damages for loss of consortium?

## STANDARD OF REVIEW

### I. Admission of Expert Testimony

The admission or exclusion of expert testimony is a matter within the sound discretion of the trial court. *Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205 (1998); *Means v. Gates*, 348 S.C. 161, 558 S.E.2d 921 (Ct.App.2001). A trial court's ruling to exclude or admit expert testimony will not be disturbed on appeal absent a clear abuse of discretion. *Mizell v.*

*Glover,* 351 S.C. 392, 570 S.E.2d 176 (2002); *Means,* 348 S.C. at 166, 558 S.E.2d at 923; *see also Lee v. Suess,* 318 S.C. 283, 457 S.E.2d 344 (1995) (admission of expert testimony is within sound discretion of trial judge and will not be overruled absent finding of abuse of discretion and prejudice to complaining party). An abuse of discretion occurs when there is an error of law or a factual conclusion that is without evidentiary support. *Bayle v. South Carolina Dep't of Transp.,* 344 S.C. 115, 542 S.E.2d 736 (Ct.App.2001).

## II. Exclusion of Testimony

It is well settled that the admission and rejection of testimony are matters largely within the trial court's sound discretion, the exercise of which will not be disturbed on appeal absent an abuse of that discretion. *Pike v. South Carolina Dep't of Transp.,* 343 S.C. 224, 540 S.E.2d 87 (2000); *Commerce Ctr. of Greenville, Inc. v. W. Powers McElveen & Assocs., Inc.,* 347 S.C. 545, 556 S.E.2d 718 (Ct.App.2001); *see also Gamble v. International Paper Realty Corp.,* 323 S.C. 367, 474 S.E.2d 438 (1996) (admission or exclusion of evidence is matter within sound discretion of trial court and, absent clear abuse, will not be disturbed on appeal). To warrant reversal, the appellant "must show both the error of the ruling and resulting prejudice." *Recco Tape and Label Co. v. Barfield,* 312 S.C. 214, 216, 439 S.E.2d 838, 840 (1994); *see also Carlyle v. Tuomey Hosp.,* 305 S.C. 187, 407 S.E.2d 630 (1991) (proof that an error caused the appellant prejudice is a prerequisite to reversal based on error where the trial court's discretion is involved). In order for this Court to reverse a case based on the erroneous admission or exclusion of evidence, prejudice must be shown. *Hanahan v. Simpson,* 326 S.C. 140, 485 S.E.2d 903 (1997); *Commerce Ctr.,* 347 S.C. at 559, 556 S.E.2d at 726; *see also Potomac Leasing Co. v. Bone,* 294 S.C. 494, 497, 366 S.E.2d 26, 28 (Ct.App.1988) ("Before the Court of Appeals will reverse a judgment for an alleged error in the exclusion of evidence, the appellant must show prejudice.").

## III. Jury Charge

It is not error for the trial judge to refuse a specific request to charge when the substance of the request is

included in the general instructions. *Varnadore v. Nationwide Mut. Ins. Co.*, 289 S.C. 155, 345 S.E.2d 711 (1986); *Brown v. Stewart*, 348 S.C. 33, 557 S.E.2d 676 (Ct.App.2001). In reviewing a jury charge for alleged error, this Court must consider the charge as a whole, in light of the evidence and issues presented at trial. *Keaton ex rel. Foster v. Greenville Hosp. Sys.*, 334 S.C. 488, 514 S.E.2d 570 (1999).

A trial court must charge the current and correct law. *Welch v. Epstein*, 342 S.C. 279, 536 S.E.2d 408 (Ct.App. 2000); *see also Brown v. Smalls*, 325 S.C. 547, 481 S.E.2d 444 (Ct.App.1997) (trial judge is required to charge current and correct law applicable to issues presented). A jury charge is correct if, when the charge is read as a whole, it contains the correct definition and adequately covers the law. *Keaton*, 334 S.C. at 495–96, 514 S.E.2d at 574. The substance of the law is what must be instructed to the jury, not any particular verbiage. *Id.* at 496, 514 S.E.2d at 574. A jury charge which is substantially correct and covers the law does not require reversal. *Id.* To entitle an appellant to reversal, the trial court's instructions must be not only erroneous, but also prejudicial. *Arkwright Mills v. Clearwater Mfg. Co.*, 217 S.C. 530, 61 S.E.2d 165 (1950).

## *LAW/ANALYSIS*

### I. ADMISSION OF EXPERT TESTIMONY

#### A. "Loss of Chance of Survival"

Worsham contends the admission of Dr. Bart Green's testimony was improper because it did not meet the "most probable" standard for recovery and the testimony merely presented a "loss of chance of survival," which is not recognized in South Carolina. We find the trial judge properly admitted the testimony.

In his deposition, Dr. Green testified:

Q: Doctor, do you have an opinion, based upon a reasonable degree of certainty, as to whether or not Mr. Burroughs['] chances of cure and survivability would have been greater had they been detected, colon cancer, in February of '96?

. . . .

[A]: Yes.

Q: And what is that opinion?

A: Colon cancer in general, if diagnosed earlier, at an earlier stage, has a much higher survivability than—than late stage as it was when I was involved in his care.

. . . .

Q: Do you have an opinion, Doctor, based upon a reasonable degree of certainty, as to whether or not it is most probably true that Jim Burroughs, his chance for cure and survival, would have been greater if the colon cancer was detected in July of '96?

A: Yes.

. . . .

Q: And what is your opinion?

A: My opinion is if it would have been detected at that time, it would have been in an earlier stage and been more curable.

Q: And does that opinion hold true for October of '96 and April of '97 as well?

A: Yes.

The specific testimony of Dr. Green to which Worsham objects is merely a portion of his overall testimony regarding whether Worsham should have diagnosed and treated the colon cancer and, if found earlier, whether Burroughs would have survived. The testimony is certainly relevant to the nature and character of the injuries, which were the natural and proximate consequences of Worsham's failure to diagnose in this case.

While the portion of testimony taken in isolation may not have met the "most probably" standard of proof required to demonstrate probable cause, we find it was relevant and properly admitted. *See Martin v. Mobley*, 253 S.C. 103, 109, 169 S.E.2d 278, 281 (1969) ("The fact that the doctor had not had opportunity to consider whether the plaintiff's permanent disability was more or less than that which generally followed such a condition and operation affected, we think, only the weight and not the admissibility of the proffered evidence."). Additionally, there was sufficient evidence to support the

jury's verdict that Burroughs' death was "most probably" the result of the failure to diagnose his cancer earlier and not merely a "loss of chance of survival."

Our Supreme Court specifically rejected the "loss of chance" doctrine in *Jones v. Owings*, 318 S.C. 72, 456 S.E.2d 371 (1995). The *Jones* Court concluded:

> After a thorough review of the "loss of chance" doctrine, we decline to adopt the doctrine and maintain our traditional approach. We are persuaded that "the loss of chance doctrine is fundamentally at odds with the requisite degree of medical certitude necessary to establish a causal link between the injury of a patient and the tortious conduct of a physician." Legal responsibility in this approach is in reality assigned based on the mere *possibility* that a tortfeasor's negligence was a cause of the ultimate harm. This formula is contrary to the most basic standards of proof which undergird the tort system.

*Id.* at 77, 456 S.E.2d at 374 (citations omitted) (emphasis in original).

■ The "loss of chance" doctrine, in the context of medical malpractice, "permits a recovery when the delay in proper diagnosis or treatment of a medical condition results in the patient being deprived of a less [than] even chance of surviving or recovering." *Id.* at 75, 456 S.E.2d at 373. The Court noted that the decedent's chance of survival was never above fifty percent, even if his lung cancer had been diagnosed earlier. *Id.* at 74, 456 S.E.2d at 372. The Court maintained South Carolina's traditional approach that, in order to recover based on medical malpractice, the plaintiff must show the negligence of the physician "most probably" caused the injury or death. *Id.* (citing *Sherer v. James*, 290 S.C. 404, 351 S.E.2d 148 (1986)).

In *Haselden v. Davis*, 341 S.C. 486, 534 S.E.2d 295 (Ct.App. 2000), *cert. granted* (January 11, 2001), this Court had the opportunity to determine whether evidence which demonstrates the negligence of a physician in failing to diagnose the decedent, who would have had a greater than fifty percent chance of survival except for the negligence of the doctor, satisfies the "most probable" standard. We concluded that, when an individual would have had a greater than fifty percent

chance of survival if the physician had properly advised the decedent at an earlier time, evidence of the failure to do so satisfies the "most probably" requirement for causation. *Id.* at 495, 534 S.E.2d at 300.

In the instant case, Dr. Randolph Baily testified regarding Burroughs' chance of survival had the cancer been diagnosed earlier. The following colloquy is demonstrative of his opinions:

Q. Doctor, in February of 1996, when he had that physical exam, do you have an opinion, based upon a reasonable degree of certainty, as to whether or not Jim Burroughs would have survived if he was diagnosed and properly treated on that date?

A. Yes, sir, I believe he would have.

. . . .

Q. Doctor, do you have an opinion if that was diagnosed, the colon cancer, in February of 1996, if Jim Burroughs would have had a normal life expectancy?

A. I believe he would have. Had the tumor been removed, then he could have had a normal life expectancy, yes.

Dr. Baily was asked the question regarding whether Burroughs would have survived and had a normal life expectancy if the cancer had been diagnosed in July of 1996, and October of 1996. In both cases, he responded that Burroughs would have likely survived and would have enjoyed a normal life expectancy.

During redirect examination, the following exchange took place:

Q. Is it your opinion that in February, July and October, Mr. Burroughs' condition was more likely than not curable?

A. Absolutely.

Q. And Doctor, do you have an opinion during those relevant time periods if it was diagnosed and treated would he have survived and lived a normal life?

A. I believe it's more likely than not that he would have, yes, sir.

The above testimony demonstrates that Burroughs would have had a greater than fifty percent chance of survival if the colon cancer had been diagnosed in February 1996, July 1996,

or October 1996. Therefore, the evidence supports the inference that the failure by Dr. Worsham to diagnose Burroughs' condition "most probably" resulted in his death and not merely in a "loss of chance of survival."

We note the trial judge properly charged the jury regarding the appropriate standard of proof that must be met by Burroughs in order for the jury to award damages. The trial judge instructed:

> Now, ladies and gentlemen, when the opinions of a medical expert are relied upon to establish a causal connection between negligence and an injury, the expert must state with reasonable certainty that in his professional opinion the injuries most probably resulted, or the death most probably resulted from the alleged negligence of the defendant. Or that expert must use words that would mean to you the same thing, that the death most probably resulted as the alleged negligence of the defendant.

The trial judge properly admitted the testimony of Dr. Green. Concomitantly, there was sufficient evidence to support the jury's determination that Worsham's diagnosis was "most probably" the proximate cause of Burroughs' death.

## B. Future Damages/Future Salary

█ Worsham argues the trial court erred in admitting testimony of Burroughs' possible future salary, which included several promotions and salary increases, as being too speculative. We find the testimony was properly admitted for consideration by the jury.

█ "Under current South Carolina law, the standard of admissibility for evidence of future damages is 'any evidence which tends to establish the nature, character, and extent of injuries which are the natural and proximate consequences of the defendant's acts ... if otherwise competent.'" *Pearson v. Bridges,* 344 S.C. 366, 372, 544 S.E.2d 617, 620 (2001) (quoting *Martin v. Mobley,* 253 S.C. 103, 109, 169 S.E.2d 278, 281–82 (1969)). The "most probable" standard required to prove causation is not the standard to be applied in determining the admissibility of evidence of future damages. *Id.* at 371, 544 S.E.2d at 619. Furthermore, "whether future medical expenses are 'reasonably certain' to occur is

also the incorrect standard to use in determining admissibility." *Id.* "Whether future damages are 'reasonably certain' to occur is the *standard of proof* for future damages, not the *standard of admissibility.*" *Id.* at 371–72, 544 S.E.2d at 619 (italics in original).

In *Pearson,* the medical expert testified that four possible scenarios could result from the alleged malpractice. For each scenario, he presented a declining statistical chance of occurrence and the possible damages which could result. The Supreme Court explained:

> The evidence of the medical expenses of scenarios two, three, and four was admissible. These scenarios tended to establish the extent of Pearson's injuries. The fact that Pearson's experts testified that the possibilities of scenarios two, three, and four occurring were 30 percent or less went to the weight of the evidence not its admissibility. Whether Pearson proved the expenses were "reasonably certain" to occur so she would be entitled to an award of future damages was a question for the jury to determine.

*Pearson,* 344 S.C. at 373, 544 S.E.2d at 620 (internal citations omitted).

In the instant case, the testimony provided a possible scenario for future advancement and income for Burroughs. James Barnish, the Assistant Vice President of hotel accounting for the Hyatt, chronicled the possible path of advancement within Hyatt. He stated:

> James had a good career up to the time that he moved to the to the corporate office, and what I personally had thought would be his next logical step would be to work for me in one of my other areas of responsibility for the IT department in the corporate office, and James had—I knew James had a real interest in the IT side, or the computer side of the business, and he preferred to go that route than the hotel accounting route, and it's difficult to hang onto people in that area, and I would have seen him progressing within the organization as long as he wanted to stay with the company, that he would have made it to a manger [sic], director and eventually an officer type level position, because he had the years of service, and Hyatt is very, very big on promoting from within.

Barnish was asked: "Were the promotions outlined with what you believed most probably would have happened for James Burroughs had he not left?" Barnish answered, "Yes." Barnish declared that the positions and salaries presented to Burroughs' economist for use in determining lost future wages were correct. Dr. Charles Alford, an economist, opined that, given the promotion track provided by Barnish, the present value of Burroughs' future wages was $1,558,749.

As in *Pearson,* whether the future damages in the case *sub judice* were established with "reasonable certainty" was a decision for the jury and did not impact the admissibility of the evidence. We iterate for the edification of the Bench and Bar that the standard for the admission of evidence is different from the standard of proof to be used by the jury in determining whether to assess damages. The question in this case, as in *Pearson,* is whether the evidence was properly admitted, not whether the evidence was sufficient to support a verdict including future damages. We conclude the evidence was properly admitted, and whether the damages were "reasonably certain" to occur was a decision for the jury.

## II. FAILURE TO ALLOW WORSHAM'S TESTIMONY

### A. Expectations Regarding Referral

Dr. Worsham claims the trial judge erred by refusing to allow him to testify as to what he expected Dr. McAlhany to do in evaluating and diagnosing Burroughs pursuant to Worsham's referral. We find no prejudicial error by the trial judge.

Worsham sought to introduce testimony regarding his expectations of what Dr. McAlhany would do to diagnose Burroughs' condition after Worsham's referral. The testimony excluded was never proffered to the court. As there was no proffer, Worsham cannot demonstrate how he was prejudiced by its exclusion. *See Baber v. Greenville County,* 327 S.C. 31, 41, 488 S.E.2d 314, 319 (1997) ("Absent a proffer, it is impossible for this Court to determine the effect of the excluded testimony.").

Moreover, on direct examination during the plaintiff's case-in-chief, Dr. Worsham testified:

A: I did not remember James Burroughs until I saw his deposition and I recognized his face, but as far as remembering him specifically, had we run into each other somewhere, no, I can't say that I truly remembered him.

Q: And just so we're clear, you were his main treating doctor, correct?

A: That's correct.

Q: You did not remember him?

A. I did not remember him specifically, no.

This testimony demonstrates with remarkable clarity the inability of Dr. Worsham to testify personally about his expectations in regard to the referral of Burroughs to Dr. McAlhany.

■ In an action for medical malpractice, the fact that a family practitioner referred the patient to a specialist does not, in and of itself, establish due care. *See Marchese v. Monaco*, 52 N.J.Super. 474, 145 A.2d 809 (1958). In spite of referral, a family practitioner still owes the patient the duty to exercise that degree of knowledge, care, skill, and learning possessed and exercised under the same or similar circumstances by a competent family practitioner. *Id.*

■ The mere fact that a family practitioner acts on the advice of another physician, even though a specialist, does not constitute a defense to an action based on unskilled treatment. *Id.* This record is replete with testimony emanating from various physicians concluding that Dr. Worsham, in diagnosing and treating the medical condition of Burroughs, failed to exercise that degree of knowledge, care, skill, and learning possessed and exercised by an ordinary, careful, and prudent family practitioner under the same or similar circumstances.

On the merits, the testimony elicited from Dr. McAlhany demonstrated that Burroughs was referred to him for treatment of an incisional hernia, and that he examined Burroughs consistent with that referral. Dr. McAlhany testified he would do further testing in the event the reason for the referral was not proper or if he was asked. He professed that he was not informed of the patient's history of abdominal pain nor was he informed of Burroughs' anemia at the time of the referral.

Dr. Worsham had ample opportunity to cross-examine Dr. McAlhany regarding whether he did further examination and whether it was something he was expected to do when a patient was referred to him. Based on the testimony presented, we find Worsham was not prejudiced by the exclusion of testimony regarding his expectations as to Dr. McAlhany. *See Means v. Gates,* 348 S.C. 161, 166, 558 S.E.2d 921, 924 (Ct.App.2001) ("Before the Court of Appeals will reverse a judgment for an alleged error in the exclusion of evidence, the appellant must show prejudice."). The trial court did not abuse its discretion in excluding Worsham's testimony regarding his expectations of Dr. McAlhany's examination.

## B. Burroughs' Failure to Follow–Up

■ Worsham maintains the judge erred in refusing to allow him to testify that his review of Dr. McAlhany's chart indicated Burroughs never returned for a follow-up visit. We determine the exclusion of this testimony was harmless as it would have been cumulative to other testimony in the record.

Worsham sought to testify, based on his reading of Dr. McAlhany's report, that Burroughs never returned for a follow-up visit. The trial court refused to allow Worsham to interpret Dr. McAlhany's records when Dr. McAlhany had already testified.

■ When Dr. McAlhany was asked whether Burroughs returned for a follow-up visit, he testified that Burroughs never returned. This point was brought out several times by Worsham's counsel during cross-examination. Therefore, the excluded testimony would have been merely cumulative to testimony already in the record. "Generally, there is no abuse of discretion where the excluded testimony is merely cumulative of other evidence proffered to the jury." *Commerce Center of Greenville, Inc. v. W. Powers McElveen & Assocs., Inc.,* 347 S.C. 545, 559, 556 S.E.2d 718, 726 (Ct.App.2001); *see also Ott v. Pittman,* 320 S.C. 72, 463 S.E.2d 101 (Ct.App.1995) (upholding trial judge's decision to exclude particular witness's testimony, which the Court of Appeals characterized as "cumulative to that of other witnesses").

The trial court did not abuse its discretion in excluding Worsham's testimony that Burroughs missed his follow-up appointment with Dr. McAlhany.

## III. JURY CHARGE

Worsham asserts the trial court erred in failing to specifically charge that the standard of care his actions must be measured against was that of an ordinary, careful, and prudent physician "in his specialty" under the same or similar circumstances. We find that when the jury charges, including the two clarifying charges, are read as a whole, the trial judge properly enounced the standard of review by which Worsham's actions should be measured.

The trial judge originally charged the jury regarding the standard of care as follows:

Now, in this case I will charge you that the law in regard to diagnosing a patient is that the degree of skill and care a physician must use in diagnosing a condition is that which would be exercised by a *competent practitioner in the defendant doctor's field of medicine.* And I will charge you that in this case the question is whether Dr. Worsham, in making a diagnosis, deviated from the applicable standard of care, either by not employing a particular procedure or by not ordering a particular test. And that is to be determined by what an ordinary, careful, and prudent physician would have done under the same or similar circumstances in this case.

... What the law does require of a physician is this, that in the practice of—*he shall exercise that degree of knowledge, care and skill ordinarily possessed by members of his profession in good standing* under the same or similar circumstances.

(emphasis added). Appellants did not object to the charge as given.

The jury submitted a question to the judge which read: "We are confused about what the law states the M.D. must do, as a minimum, to meet the standards of care." Appellants' attorneys then requested a charge to the jury "add[ing] the defendant doctor's field of medicine." The trial judge gave the following clarifying charge:

In this case, the law in South Carolina is, the question of whether a physician in making a diagnosis deviated from the applicable standard of care, either by not employing a particular procedure or by not administering a particular test, is to be determined by what an ordinary, careful and prudent physician would have done under the same or similar circumstances.

The jury submitted a second question requesting further clarification of the standard of care and its application in this case. The judge charged the jury:

Now, doctors must do what an ordinary, reasonable, prudent doctor would do under the same or similar circumstances. If a doctor does something or fails to do something that an ordinary, reasonable doctor should have done under the—under those circumstances then it would be negligence. Okay.

As a general rule, you and I do not know what the standards of care are. Therefore we have to learn or hear what the standards of care are through expert witnesses, or expert testimony what are generally recognized and accepted practices and procedures which should be followed by the average, competent *doctor in the defendant's profession,* under the same or similar circumstances.

(emphasis added). Appellants did not object to this charge as given.

In *King v. Williams,* 276 S.C. 478, 482, 279 S.E.2d 618, 620 (1981), the Supreme Court held: "The degree of care which must be observed is, of course, that of an average, competent practitioner acting in the same or similar circumstances." Since the *King.* decision, this Court has defined medical malpractice as "the failure of a physician to exercise that degree of care and skill which is ordinarily employed by the profession generally, under similar conditions and in like surrounding circumstances." *Jernigan v. King,* 312 S.C. 331, 333, 440 S.E.2d 379, 381 (Ct.App.1993). "The standard for recovery has been summarized, 'To recover for medical malpractice, a plaintiff must show failure by a physician to exercise that degree of care and skill which is ordinarily employed by the profession *under similar conditions and in like circumstances.'* " *Keaton ex rel. Foster v. Greenville Hosp. Sys.,* 334

S.C. 488, 496, 514 S.E.2d 570, 574 (1999) (quoting *Bonaparte v. Floyd*, 291 S.C. 427, 434, 354 S.E.2d 40, 45 (Ct.App.1987)) (emphasis in original).

While the first clarifying charge fails to specifically state that the standard of care is based on a doctor in the same field of medicine, both the main charge and the second clarifying charge elucidate the jury as to the requirement that Worsham's actions are to be juxtaposed to those of a doctor in the same field of medicine. In looking at the charges given as a whole, we find no prejudicial error in the clarifying charge's failure to indicate that the standard of care is compared to doctors in the same field of medicine. *See Keaton*, 334 S.C. at 497, 514 S.E.2d at 575.

■ Worsham complains that the testimony establishing the standard of care was not by a medical professional in the area of family medicine, but was explained by an internal medicine specialist and a surgeon. We rule the experts who testified properly detailed the standard of care for a family practitioner based on their knowledge and experiences.

Dr. Daniel Derman is board certified in internal medicine. He testified the standard of care for a family practitioner diagnosing and treating a patient with symptoms of colon cancer is the same as the standard in internal medicine. Specifically, he stated: "[F]or primary care in terms of being the first one on the front line, so to speak, who might see a colon cancer, it would not only be the same for family practice as internal medicine, but it's going to be the same all over the country as well."

Dr. Randolph Baily, a colorectal surgeon, detailed his background and how he was qualified to establish the standard of care for family practitioners. He testified that he has taught diagnosis and treatment of colon cancer to students and residents in family practice at Baylor College of Medicine and the University of Texas Medical School in Houston. In addition, he declared that diagnosing colon cancer is something taught in medical school to all students regardless of their specialties. According to Dr. Baily, Worsham's actions failed to meet the appropriate standard of care for diagnosing and treating colon cancer.

Finally, Dr. Meher Medavaram, Burroughs' family practice doctor in Chicago, testified that the standard of care for family practitioners was consistent throughout the United States. She asserted Worsham failed to properly perform tests to determine the cause of Burroughs' anemia. She professed the standard of care required the performance of additional tests to rule out colon cancer.

The testimony presented by Burroughs' expert witnesses established the standard of care for a doctor in family practice. The experts were each qualified to detail the standard of care in family practice. Thus, the testimony was properly admitted. *See Means v. Gates,* 348 S.C. 161, 558 S.E.2d 921 (Ct.App.2001) (admission or exclusion of expert testimony is matter within sound discretion of trial court, whose decision will not be disturbed on appeal absent abuse of discretion).

We find no error in the jury charge or the testimony by Burroughs' experts used to establish and clarify the standard of care.

## IV. INCONSISTENT VERDICTS

 Appellants allege the jury's verdicts finding them liable for the wrongful death cause of action, but finding no liability for loss of consortium were inconsistent, and, therefore, a new trial should have been ordered. We find the argument raised is not properly preserved. Moreover, the assertion fails on the merits, as the causes of action are separate and distinct, and the verdicts were entirely consistent.

The reading of the verdict by the trial judge and any subsequent objections are not included in the Record on Appeal. It is impossible for us to determine whether Appellants raised timely objections to the issue of the inconsistent verdicts. As such, the issue is not properly preserved for review on appeal. *See Smith v. Phillips,* 318 S.C. 453, 458 S.E.2d 427 (1995) (noting appellate court could not consider propriety of jury's verdict which found neighbor liable for nuisance but awarded no damages, where there was no objection at trial by neighbor or landowner which brought nuisance action, and neither party raised issue on appeal); *Stevens v. Allen,* 336 S.C. 439, 520 S.E.2d 625 (Ct.App.1999), *aff'd,* 342

S.C. 47, 536 S.E.2d 663 (2000) (holding there is no duty imposed on trial judge to question jury's verdict of liability, but no damages, unless requested to by a party).

The order denying Appellants' motions for judgment notwithstanding the verdict and for a new trial absolute is in the Record on Appeal. However, the motions themselves are not. The order incorporates by reference the post-trial motions made during the hearing. Yet, the portion of the hearing in which the motions were made is not included in the Record on Appeal. The order finds the motions not preserved. The only possible reference to this issue is where the judge notes: "[T]he Defendants failed to make a timely objection to the form of the jury verdict thereby waiving same." The Record on Appeal does not allow us to determine whether a proper objection or motion for a new trial was made based on this specific issue. Appellants had the burden to furnish a sufficient record from which an intelligent review could be conducted. *See D & D Leasing Co. v. Gentry*, 298 S.C. 342, 380 S.E.2d 823 (1989) (emphasizing that burden is on appellant to furnish a sufficient record from which an intelligent review can be conducted and finding that appellant did not meet this burden; thus, the appellate court properly dismissed the appeal).

In addition, Appellants' claims fail on the merits. Under South Carolina law, unlike that of some other states, loss of consortium is an independent action, not derivative. *Preer v. Mims*, 323 S.C. 516, 476 S.E.2d 472 (1996); *Stewart v. State Farm Mut. Auto. Ins. Co.*, 341 S.C. 143, 533 S.E.2d 597 (Ct.App.2000). "Although loss of consortium is an independent action, case law has held the right of action does not accrue until the loss of the services, society and companionship of the spouse has actually occurred, which has been defined as the point when the spouse sustained the injuries." *Stewart*, 341 S.C. at 156, 533 S.E.2d at 604. "Loss of consortium arises out of the special relationship between a husband and wife." *Id.* "Any person may maintain an action for damages arising from an intentional or tortious violation of the right to the companionship, aid, society and services of his or her spouse." S.C.Code Ann. § 15-75-20 (1977).

According to the Wrongful Death Act: "Whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages." S.C.Code Ann. § 15–51–10 (1977). "Every such action shall be for the benefit of the wife or husband and child or children of the person whose death shall have been so caused, and, if there be no such wife, husband, child or children, then for the benefit of the parent or parents, and if there be none such, then for the benefit of the heirs of the person whose death shall have been so caused." S.C.Code Ann. § 15–51–20 (Supp.2001).

■ This Court has identified factors to be considered in assessing damages under the Wrongful Death Act. "The general elements of damages recoverable are: (1) pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, (5) loss of companionship, and (6) deprivation of the use and comfort of the intestate's society, including the loss of his experience, knowledge, and judgment in managing the affairs of himself and of his beneficiaries." *Self v. Goodrich,* 300 S.C. 349, 351, 387 S.E.2d 713, 714 (Ct.App.1989).

While the factors to consider for damages in a wrongful death action include loss of consortium, we find this is not sufficient to say that a plaintiff's verdict on wrongful death and a defense verdict on loss of consortium are inconsistent. First, the parties benefiting from the actions may be separate and distinct. Only the spouse may bring a loss of consortium claim. However, the spouse, children, parents, or other heirs may be the beneficiaries of the wrongful death award.

Additionally, the statute establishes that the claim for loss of consortium is to compensate the spouse for "tortious violation of the right to the companionship, aid, society and services of his or her spouse." § 15–75–20. In contrast, a wrongful death claim is to compensate the heirs of a decedent, who, if he had survived, could have brought a personal injury action. § 15–51–10. This Court, as well as the South Carolina Supreme Court, has ruled claims for personal injury and loss of consortium are separate and distinct claims, and a ruling on

one does not bar, nor entitle, recovery on the other claim. *See, e.g., Graham v. Whitaker*, 282 S.C. 393, 321 S.E.2d 40 (1984); *Page v. Crisp*, 303 S.C. 117, 399 S.E.2d 161 (Ct.App. 1990).

We find that, as a wrongful death claim is premised on the decedent's ability to have brought a personal injury claim if he had survived, the rulings in the cases of *Graham* and *Page* are apposite and analogous to the present case. Verdicts awarding damages for wrongful death, but finding for the defense on loss of consortium, are not inconsistent. We hold the two claims are separate and distinct, and, as pronounced in *Page*, "[e]ach litigant was entitled to a verdict based on the law and the evidence." *Page*, 303 S.C. at 119, 399 S.E.2d at 162.

## CONCLUSION

We rule the testimony of Dr. Green was properly admitted because it did not violate the "loss of chance of survival" doctrine. We find that the testimony regarding Burroughs' future promotion opportunities and possible salaries was admissible as it explained the extent and nature of Burroughs' injuries. We further remind the Bench and Bar that the standard of admissibility is different from the standard of proof for evidence of future damages. We hold the trial judge did not err in excluding Worsham's testimony regarding his expectations of Dr. McAlhany's care or Burroughs' failure to follow up with Dr. McAlhany. Testimony was already in the record, making Worsham's testimony cumulative and unnecessary. The trial judge's charges, when viewed as a whole, were proper and adequate statements of the law of South Carolina regarding the standard of care for a family practitioner. We determine the claims of wrongful death and loss of consortium are separate and distinct causes of action. Apodictically, we conclude the jury's verdicts, one awarding damages for wrongful death and the other denying damages for loss of consortium, were not inconsistent. Accordingly, the judgment of the Circuit Court is

**AFFIRMED.**

HEARN, C.J., and CURETON, J., concur.