629 S.E.2d 675

Terry STOKES, as Personal Representative of the
Estate of Jennings E. Stokes, Appellant,

v.

SPARTANBURG REGIONAL MEDICAL CENTER; and Robert
A. Cochran, Jr., M.D., and David C. Hull, M.D., each individual-
ly and as Agents/Employees of Hull, Green, Woods, Cochran
and Woollen; and Hull, Green, Woods, Cochran and Woollen;
and John Graham, CRNA, Defendants,

of whom SPARTANBURG REGIONAL MEDICAL
CENTER is Respondent.

No. 4078.

Court of Appeals of South Carolina.

Heard Nov. 10, 2005.
Decided Jan. 23, 2006.
Rehearing Denied May 18, 2006.

516

Kristi F. Curtis, David W. Goldman, Diane M. Rodriguez, all of Sumter, for Appellant.

Perry Boulier and Ginger D. Goforth, both of Spartanburg, for Respondent.

HEARN, C.J.:

In this medical malpractice action, Terry Lee Stokes, the personal representative of Jennings E. Stokes's estate, ap-

peals from a jury verdict in favor of Spartanburg Regional Medical Center (the Hospital). Appellant argues the trial judge erred in failing to instruct the jury that it could draw a negative inference from the Hospital's failure to preserve critical pieces of medical evidence. We reverse and remand.

## FACTS

On June 10, 1998, Jennings Stokes, age seventy-seven, underwent surgery to remove his thyroid and lymph nodes, which were cancerous. Dr. Hull performed the surgery at the Hospital. No complications arose during the surgery, and according to Dr. Hull, Stokes's prognosis was very good.

After surgery, Stokes was transferred to the post-anesthesia care unit (recovery room), where he remained for two hours. While there, he received oxygen through a mask, and nurses monitored his oxygen saturation levels with a device called a pulse oximeter. During this two-hour stay in the recovery room, Stokes received five doses of morphine for pain, and nurses called Dr. Hull two times because of bloody drainage coming from the neck incision.

From the recovery room, Stokes was transferred to the third floor of the Hospital, which is designated "pediatrics." [1] While on the third floor, Stokes no longer had an oxygen mask and was not being monitored with a pulse oximeter. Stokes arrived on the third floor at 6:45 p.m., and according to the nurse's notes, by 7:30 p.m., his neck was "swollen" and his wound dressing was "saturated." Thirty minutes later, Stokes complained of pain and received Demerol combined with Phenergan, a narcotic medication. According to the nurse, Stokes began having "difficulty breathing" at 8:30 p.m., and at 8:55 p.m., his breathing stopped. Five minutes later, a "code" was initiated.

During the code, a nurse anesthetist tried to intubate Stokes in order to provide him with oxygen, but the intubation was unsuccessful. The nurse anesthetist called the anesthesiologist for help. Dr. Cochran, a partner of Dr. Hull's, was also notified of the code, and took charge of the resuscitation.

---

1. The third floor is also an "overflow area" for patients receiving urological or gynecological surgery.

At 9:21 p.m., Dr. Long, the anesthesiologist, arrived and successfully intubated Stokes. Despite the intubation, Stokes could not be revived. Dr. Cochran signed the death certificate, stating the cause of death was "respiratory failure."

Stokes's daughter-in-law, Ann, is a registered nurse and has worked in the Hospital's recovery room for fifteen years. Ann was by Stokes's side while he was in the recovery room, and she stayed with him even when he was transferred to the third floor. While Ann was there, other nurses were charged with caring for Stokes, but Ann monitored him as well.

After Stokes died, his son, Terry, served as the personal representative of Stokes's estate, and it was in this capacity that Terry (hereinafter Appellant) brought a survivorship action and wrongful death action against the Hospital and other defendants who are not parties to this appeal. At trial, Appellant and the Hospital disputed the cause of Stokes's death.

Appellant argued that Stokes died from a lack of oxygen, which could have been prevented if the Hospital's staff had not deviated from the standard of care for a patient recovering from a thyroidectomy. According to Appellant's experts, a well-known complication of this type of surgery is airway obstruction caused by the swelling of soft tissue in the patient's neck or postoperative bleeding, which can collect in one area and form a hematoma. A hematoma is especially dangerous after surgery to the neck because it can clog a patient's windpipe. To decrease the chance of a patient's airway being obstructed, Appellant's experts testified the patient should be on supplemental oxygen and vigilantly monitored for signs of respiratory distress. The experts further opined that a tracheotomy procedure kit should be kept next to the patient's bed in the event the patient's airway becomes so obstructed that an intubation tube cannot be placed into the patient's throat and a "surgical airway" must be created. It was the Appellant's position that the Hospital deviated from the standard of care by transferring Stokes to the third floor, where the nurse in charge had never cared for a thyroidectomy patient before and was not instructed to continue administering oxygen to Stokes. The Appellant further argued Stokes's

third floor placement was unacceptable because there was no tracheotomy kit at his bedside.

The Hospital argued that Stokes died from a sudden and unexpected event, most probably a heart attack. It relied heavily on Ann, who testified as both an eyewitness and an expert witness. According to Ann, Stokes showed no signs of respiratory distress, though his respirations did slow down after he received pain medication. Ann found this reaction normal, but out of an abundance of caution, she stepped outside the room and asked for a pulse oximeter to measure his oxygen saturation level. She testified she left the room for less than a minute, and when she returned, she found Stokes's condition had deteriorated rapidly. His breathing was shallow, his pulse weak, and he was unresponsive. The Hospital also presented evidence that Stokes had suffered a minor heart attack sometime prior to the surgery.

During trial, Appellant pointed out two pieces of medical documentation that were missing from Stokes's medical records. First, there was evidence that blood had been drawn from Stokes's artery during the code. This blood sample was drawn so that an arterial blood gas could be performed, which would indicate whether oxygen was reaching Stokes's bloodstream. The medical records, however, did not contain the results from this test. The second piece of missing evidence was the vital signs flow chart prepared by the floor nurse at the time of Stokes's death. The Hospital was unsure why the chart was missing, but speculated that it was misplaced during the code.

At trial, the judge held a conference to discuss jury charges. One of Plaintiff's requested charges was a "spoliation of evidence" charge, which allowed jurors to draw a negative inference if it found the Hospital's explanation regarding the missing records unsatisfactory. The trial judge agreed to the charge, and the Hospital did not object. However, when it came time to charge the jury, the trial judge failed to give the "spoliation of evidence" instruction. Appellant objected, but the court overruled the objection, explaining: "That charge I have some problems with this."

When the jury came back with a defense verdict, Appellant's counsel moved for a new trial based on the jury charge.

The trial judge denied the motion, stating: "I could not have charged it as written I don't believe. I would have had to have modified it. And hopefully, my charge as a whole covered it and didn't prejudice your case in any way I hope." This appeal followed.

## STANDARD OF REVIEW

A trial court is required to charge the current and correct law. *Burroughs v. Worsham*, 352 S.C. 382, 392, 574 S.E.2d 215, 220 (Ct.App.2002). When reviewing a jury charge for alleged error, our court must consider the charge as a whole, in light of the evidence and issues presented at trial. *Id.* An erroneous jury charge will not result in a verdict being reversed unless the charge prejudiced the appellant's case. *Id.*

## LAW/ANALYSIS

Appellant argues the trial court erred in failing to instruct the jury on "spoliation of evidence," especially when the Hospital did not object to the proposed charge.[2] We agree.

In *Welsh v. Gibbons*, 211 S.C. 516, 46 S.E.2d 147 (1948), *distinguished by Ex parte Goodyear Tire & Rubber Co.*, 248 S.C. 412, 415–16, 150 S.E.2d 525, 526–27 (1966), our supreme court recognized circumstances under which a jury should be able to consider missing evidence. In *Welsh*, the plaintiff sued a bottling plant, alleging it sold a soft drink which contained poison. The plaintiff had in his possession the bottled drink, but neither tested the contents himself nor allowed the defendant to test its contents. The supreme court held "the evidence excluded was a circumstance which the jury should have been permitted to consider." *Id.* The court also noted, "it is open to the plaintiff to explain his refusal to allow a

---

2. The Hospital initially argues this issue is not preserved for review because the term "spoliation of evidence" was never referenced at trial. While the exact term was not used, Appellant undeniably requested the jury be instructed that it could, but was not required to, draw a negative inference when a party fails to preserve material evidence for trial. Thus, we find the Hospital's lack of preservation argument to be manifestly without merit. *See* Rule 220(b)(2), SCACR ("The court of appeals need not address a point that is manifestly without merit.").

chemical analysis to be made of the contents of this bottle and on another trial he is at liberty to do so."

Relying on the holding in *Welsh*, our supreme court later upheld a jury charge which advised that "when evidence is lost or destroyed by a party an inference may be drawn by the jury that the evidence which was lost or destroyed by that party would have been adverse to that party." *Kershaw County Bd. of Educ. v. U.S. Gypsum Co.*, 302 S.C. 390, 394, 396 S.E.2d 369, 372 (1990). In *Kershaw*, the school board sued the manufacturer of the ceiling plaster that had been installed in many of Kershaw County's schools, alleging the plaster contained asbestos. The trial court issued an order requiring the manufacturer be notified prior to any asbestos being removed. Despite this order, the school board did not notify the manufacturer before asbestos abatement was conducted at one of its schools, so the manufacturer moved for judgment in its favor on the claims related to that school. The trial court denied the motion, but charged the jury as described above. In upholding the charge, the supreme court stated: "[T]he trial court's decision was proper under the facts of this case." *Id.*

In the case at hand, there was evidence that two pieces of medical evidence were missing from Stokes's record: results from a blood test and the floor nurse's chart detailing Stokes's vital signs on the evening of his death. Rebutting that evidence, the Hospital suggested the blood drawn from Stokes's artery on the night of his death may never have been sent to the laboratory for testing. As for the missing chart, the Hospital speculated it may have been lost during the code.[3] While the jury may well have accepted the Hospital's explanations, it was also in its province to draw a negative inference from the Hospital's failure to produce those pieces of evidence. *See id.*

---

3. In its brief, the Hospital also argues there was no evidence the vital signs flow chart maintained by the floor nurse was missing because the nurse did not testify at trial. However, several other witnesses testified that they reviewed the nurse's deposition and that she filled out the chart during her treatment of Stokes. This testimony came in without objection, and therefore the jury was presented with evidence that the chart was missing.

Appellant requested the trial court charge the jury as follows:

I charge you that when a party fails to preserve material evidence for trial, it is for you to determine whether the party has offered a satisfactory explanation for that failure. If you find the explanation unsatisfactory, you are permitted—but not required—to draw the inference that the evidence would have been unfavorable to the party's claim.

We believe this language reflects the law of South Carolina and should have been charged based on the evidence presented in this case. While we recognize that no exact language is required, the charge as given made no mention of missing evidence at all. Thus, we cannot say, as the Hospital urges, that the substance of the request was included in the trial judge's general instructions.

■ In addition to being erroneous, we find the failure to charge on "spoliation of evidence" was prejudicial to Appellant. Appellant's malpractice claim against the Hospital hinged on the jury believing Stokes died from lack of oxygen rather than from a sudden and unexpected heart attack. Both pieces of evidence the Appellant alleges are missing would have helped determine how Stokes died. Thus, it was crucial to Appellant's case that the jury know it could draw a negative inference from the Hospital's failure to produce those important pieces of evidence. We therefore find the Appellant was prejudiced by the trial court's failure to instruct the jury on "spoliation of evidence." *See, e.g., Baker v. Weaver,* 279 S.C. 479, 309 S.E.2d 770 (Ct.App.1983) (finding trial court's erroneous jury charge prejudicial where requested instruction involved a substantial feature of the case).

## CONCLUSION

Based on the foregoing, we find that the trial court erred in failing to charge the jury on "spoliation of evidence" and that this error was prejudicial. Accordingly, we reverse and remand for a new trial.

**REVERSED and REMANDED.**

HUFF and WILLIAMS, JJ., concur.