# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Rita Pratt, Individually and as the Personal Representative of the Estate of William Pratt, Deceased, Respondent,

v.

Amisub of SC, Inc. d/b/a Piedmont Medical Center; Jaleesa Heyward, RN; South Carolina Emergency Physicians, LLC; Jonas Varaly, DO; Rock Hill Radiology Associates, LLC; and Geoffrey T. Gilleland, M.D.; Defendants,

of which Rock Hill Radiology Associates, LLC, and Geoffrey T. Gilleland, M.D., are the Appellants.

Appellate Case No. 2020-000838

———————

Appeal From York County
Daniel Dewitt Hall, Circuit Court Judge

———————

Opinion No. 6096
Heard March 5, 2024 – Filed January 15, 2025

———————

**AFFIRMED**

———————

Matthew Holmes Henrikson, of Henrikson Law Firm, LLC, of Greenville, and Andrew F. Lindemann, of Lindemann Law Firm, P.A., of Columbia, both for Appellants.

Chad Alan McGowan, Ashley White Creech, Jordan Christopher Calloway, and Eve Schafer Goodstein, all of

McGowan Hood Felder & Phillips, of Rock Hill, for Respondent.

───────────

**MCDONALD, J.:** In this medical malpractice appeal, Rock Hill Radiology Associates, LLC and Geoffrey T. Gilleland, M.D. (Appellants) argue the circuit court erred in (1) denying their motions for directed verdict, judgment notwithstanding the verdict (JNOV), or a new trial absolute; (2) requiring the jury to allocate fault; (3) failing to reduce the verdict in accordance with the statutory noneconomic damages cap; and (4) failing to properly allocate setoffs following a partial settlement. We affirm.

**Facts and Procedural History**

William "Bill" Pratt had liver cancer; by September 2014, he had been diagnosed with Stage IV carcinoma with metastasis into the adrenal gland. Pratt also had a history of Hepatitis C, cirrhosis, and a compression fracture at cervical spine C-2.

In February 2015, Pratt and his wife (Wife), moved from Florida to Rock Hill to be closer to their oldest daughter (Daughter) and her two young children. Around 12:30 a.m. on March 2, 2015, Pratt fell down a flight of stairs at Daughter's home. When Daughter found Pratt at the bottom of the stairs, he was "[b]loody, battered, broken, [and in the] fetal position. There was blood everywhere, all over the wall, down the wall. His teeth were knocked out. His head was opened." Emergency medical services transported Pratt to Piedmont Medical Center (PMC), where emergency medicine physician Jonas Varaly[1] and nurse Jeleesa Heyward treated him. Pratt's chief complaints were rib and head pain.

Dr. Varaly ordered several diagnostic tests including, but not limited to, CT scans of the cervical spine, chest, and brain. Virtual Radiology Corporation initially read these scans as negative, but Dr. Gilleland, of Rock Hill Radiology Associates, read the chest CT scan as showing nine non-displaced rib fractures.[2] He also noted a

───────────

[1] Dr. Varaly is associated with South Carolina Emergency Physicians, LLC.

[2] Dr. Anthony Lupetin was qualified without objection as plaintiff's expert in diagnostic radiology. Dr. Lupetin testified that "non-displaced rib fractures" are commonly referred to as "buckle fractures." He further explained the word "fracture" here referenced an angular deformation, as there was no crack, fracture

metastatic sternal lesion, emphysema, and a large adrenal mass. Although Dr. Gilleland recorded his reading at 8:22 a.m. and placed it in Pratt's medical record, he never called it in to the emergency room or otherwise notified Dr. Varaly of the fractures or of any discrepancy in his reading versus that of Virtual Radiology.[3]

Within a few hours of his arrival in the emergency room, Pratt was discharged with a prescription for Percocet and instructions to follow up with Carolina Ortho Surgery Associates in two to three days. EMS transported him back to Daughter's home, where he spent the next thirty-six hours on a sofa. On the morning of March 4, EMS transported Pratt to the emergency department at Carolinas Medical Center-Pineville (CMC) with complaints of difficulty walking, chest pain, and back pain. There, he had another chest CT, which again identified the nine non-displaced rib fractures. Dr. Lupetin later explained, "The left lower lobe of the lung developed multiple findings, including thickening of the wall of the bronchi, down there, some increased secretions. He was probably developing pneumonia at that point."

Pratt was intubated and airlifted to Carolinas Medical Center-Main. A few days later, he was diagnosed with pneumonia. On March 16, Pratt went into respiratory distress, followed by renal failure. Pratt was discharged to palliative care on March 21; he died on March 23.[4]

Wife filed this action alleging Appellants were negligent in failing to follow the policy in place at PMC "to resolve the discrepancy between the interpretation of Dr. Gilleland and the teleradiologist" and in "failing to notify [Pratt's] treating physicians of the concerning CT Scan results." The circuit court later consolidated this matter with Wife's action against Amisub and other medical providers.

---

line, break, or bone separation in any rib. Dr. Lupetin opined that a radiologist should describe Pratt's fractures as "acute buckle fractures. There's nothing subtle about that." And, on cross-examination, he reiterated that "a qualified radiologist should look at these studies and say they're acute fractures."

[3] Dr. Lupetin testified Dr. Gilleland violated the standard of care and the hospital's standard of practice in failing to timely inform Dr. Varaly of the rib fractures.

[4] Pratt's immediate cause of death was respiratory failure.

At the subsequent jury trial, Appellants moved for a directed verdict after Wife's case-in-chief and again at the close of the evidence. The circuit court directed a verdict in favor of Emergency Physicians, LLC and denied the other motions.

During trial, Wife settled with Amisub for $250,000. The jury returned defense verdicts for Dr. Varaly on all claims and for Appellants on the wrongful death claim, but found in Wife's favor on the survival and loss of consortium claims. The jury allocated fault at 90% to Dr. Gilleland and 10% to Rock Hill Radiology, awarding damages of $360,000 on the survival claim and $640,000 for loss of consortium. The jury further found Appellants were reckless or grossly negligent, rendering inapplicable the statutory limitation on noneconomic damages. The jury declined to award punitive damages.

Appellants moved post-trial for JNOV or a new trial absolute. In the alternative, Appellants requested reduction of the verdict pursuant to the noneconomic damages cap of section 15-32-220 of the South Carolina Code (2005 & Supp. 2024) and sought to set off the $250,000 Amisub settlement. The circuit court denied most of these motions but granted setoffs of $83,333.33 against both the survival and loss of consortium claims. The circuit court later denied Appellants' Rule 59(e), SCRCP motion to alter or amend the judgment.

**Standard of Review**

"When reviewing a motion for directed verdict or JNOV, an appellate court must employ the same standard as the trial court." *Byrd as Next Friend of Julia B. v. McLeod Physician Assocs. II*, 427 S.C. 407, 412-13, 831 S.E.2d 152, 154 (Ct. App. 2019) (quoting *Wright v. Craft*, 372 S.C. 1, 18, 640 S.E.2d 486, 495 (Ct. App. 2006)). "[W]e reverse only when there is no evidence to support the ruling or when the ruling is governed by an error of law." *Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 42, 691 S.E.2d 135, 145 (2010). "Whether to grant a new trial is a matter within the discretion of the trial judge, and this decision will not be disturbed on appeal unless it is unsupported by the evidence or is controlled by an error of law." *Id.* at 49, 691 S.E.2d at 149.

**Analysis**

  I.   **Directed Verdict and JNOV**

Appellants argue the circuit court erred in denying their motions for directed verdict and JNOV as to Wife's survival and loss of consortium claims because the

jury's verdict demonstrates Wife failed to prove proximate cause. Appellants contend the circuit court further erred in denying their dispositive motions addressing gross negligence, recklessness, willfulness, and wantonness and in failing to strike punitive damages at the directed verdict stage. We disagree.

When ruling on a directed verdict or JNOV motion, the circuit court must view the evidence and the inferences that reasonably can be drawn from such in the light most favorable to the nonmoving party. *Sabb v. S.C. State Univ.*, 350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002). This court follows the same standard. *Welch v. Epstein*, 342 S.C. 279, 299, 536 S.E.2d 408, 418 (Ct. App. 2000). An appellate court will reverse the circuit court's ruling only when no evidence supports the ruling or when an error of law controls. *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 434-35, 629 S.E.2d 642, 648 (2006). "[N]either the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence." *Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 463, 629 S.E.2d 653, 663 (2006).

### A. Wrongful Death and Loss of Consortium Claims – Proximate Cause and the Verdict Form

"In South Carolina, claims for personal injuries and for loss of consortium are separate and distinct." *Lee v. Bunch*, 373 S.C. 654, 662, 647 S.E.2d 197, 201 (2007); *see also Stewart v. State Farm Mut. Auto. Ins. Co.*, 341 S.C. 143, 156, 533 S.E.2d 597, 604 (Ct. App. 2000) ("Under South Carolina law, unlike that of some other states, loss of consortium is an independent action, not derivative."). "Loss of consortium arises out of the special relationship between a husband and wife." *Stewart*, 341 S.C. at 156, 533 S.E.2d at 604. "Although loss of consortium is an independent action, case law has held the right of action does not accrue until the loss of the services, society and companionship of the spouse has actually occurred, which has been defined as the point when the spouse sustained the injuries." *Id.* "Any person may maintain an action for damages arising from an intentional or tortious violation of the right to the companionship, aid, society and services of his or her spouse. *Provided*, that such action shall not include any damages recovered prior thereto by the injured spouse." S.C. Code Ann. § 15-75-20 (Supp. 2024).

South Carolina's Wrongful Death Act states:

> Whenever the death of a person shall be caused by the
> wrongful act, neglect or default of another and the act,

> neglect or default is such as would, if death had not
> ensued, have entitled the party injured to maintain an
> action and recover damages in respect thereof, the person
> who would have been liable, if death had not ensued,
> shall be liable to an action for damages.

S.C. Code Ann. § 15-51-10 (Supp. 2024); *see also* S.C. Code Ann. § 15-51-20 (Supp. 2024) (providing a wrongful death action "shall be for the benefit of the wife or husband and child or children . . . and, if there be no such wife, husband, child or children, then for the benefit of the parent or parents, and if there be none such, then for the benefit of the heirs").

Here, the circuit court charged the jury as to Wife's burden of proving Appellants' negligence proximately caused Pratt's death and as to damages considerations in wrongful death, survival, and loss of consortium actions. Some of the damages available to Wrongful Death Act statutory beneficiaries may coincide with those claimed by a surviving spouse through a loss of consortium claim. On the verdict form, the jury found Appellants' breach of the standard of care "was the proximate cause of Mr. William Pratt's injuries" and returned a monetary award on the survival and loss of consortium claims. The jury left blank the verdict form's line for damages on the wrongful death claim.[5]

Appellants argue the jury's verdicts cannot be logically reconciled due to the finding that Wife failed to prove damages for Pratt's wrongful death. They further contend that based on this record, it is illogical to conclude Wife individually proved her claim for loss of consortium but as personal representative failed to prove wrongful death. We disagree.

---

[5] Appellants objected to one proposed jury charge but voiced no complaint regarding the fault allocation question or the verdict form generally. After the circuit court instructed the jury, it gave the parties a second opportunity for motions relating to the charges and verdict form; Appellants reiterated their singular objection to the charge but otherwise raised no error. Thus, to the extent Appellants now seek to challenge the verdict form, we find their arguments unpreserved. *See Gause v. Smithers*, 403 S.C. 140, 151, 742 S.E.2d 644, 650 (2013) (finding verdict form issue unpreserved because "Father did not object to the caption form until after the verdict had been read"); *Johnson v. Hoechst Celanese Corp.*, 317 S.C. 415, 421, 453 S.E.2d 908, 912 (Ct. App. 1995) (holding that by failing to object to a verdict form until after the verdict had been reached, a party failed to preserve any issue related to the verdict form).

A new trial should be granted where verdicts are "irreconcilably inconsistent"; however, it is the court's duty "to sustain verdicts when a logical reason for reconciling them can be found." *Austin*, 387 S.C. at 49-50, 691 S.E.2d at 149. In *Self v. Goodrich*, this court noted the applicable factors for assessing damages under the Wrongful Death Act include: "(1) pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, (5) loss of companionship, and (6) deprivation of the use and comfort of the [decedent's] society, including the loss of his experience, knowledge, and judgment in managing the affairs of himself and of his beneficiaries." 300 S.C. 349, 351, 387 S.E.2d 713, 714 (Ct. App. 1989). While some of these factors address loss of companionship and consortium, it "is not sufficient to say that a plaintiff's verdict on wrongful death and a defense verdict on loss of consortium are inconsistent." *Burroughs v. Worsham*, 352 S.C. 382, 406, 574 S.E.2d 215, 227 (Ct. App. 2002). The "parties benefiting from the actions may be separate and distinct. Only the spouse may bring a loss of consortium claim. However, the spouse, children, parents, or other heirs may be the beneficiaries of the wrongful death award." *Id.* "[A] ruling on one does not bar, nor entitle, recovery on the other claim." *Id.* at 406-07, 574 S.E.2d at 227.

Appellants further argue such an interpretation of the verdict "defies common sense and the evidence in the record" and "the only logical explanation for the jury's verdict is a defense verdict based on the issue of proximate cause" because "in effect, the jury found that the breach of the standard of care did not proximately cause [Pratt's] death." However, Appellants failed to pursue this argument before the jury was discharged; thus, the circuit court did not have the opportunity to address any perceived inconsistency. *See Ex Parte Travelers Home & Marine Ins. Co. v. Stringfellow*, 427 S.C. 238, 242, 830 S.E.2d 718, 720 (Ct. App. 2019) ("Some post-trial motions—such as those seeking to correct or clarify an inconsistent verdict—must for practical reasons be made before the jury is discharged, or they are forever lost."); *Stevens v. Allen*, 342 S.C. 47, 53, 536 S.E.2d 663, 666 (2000) ("We agree with the Court of Appeals' conclusion that, under South Carolina law, the proper and most consistent approach of treating such verdicts is to require, upon request, the trial court to re-submit the matter to the jury."); *Longshore v. Saber Sec. Servs., Inc.*, 365 S.C. 554, 563, 619 S.E.2d 5, 10 (Ct. App. 2005) (explaining "[n]either party moved the trial court to resubmit the matter to the jury, and the trial court had no authority or duty to do so in the absence of such a motion"). And, as previously noted, the jury specifically found in Wife's favor on the question of proximate cause.

Citing *Hoard v. Roper Hospital, Inc.*, 387 S.C. 539, 694 S.E.2d 1 (2010), Appellants assert the two-day delay in diagnosis attributable to their errors was

harmless because "there is no evidence that the rib injury would have been treated any differently in those two days." In *Hoard*, the plaintiffs argued a radiologist breached the standard of care by failing to properly report that a catheter inserted in an infant was "malpositioned." *Id.* at 544, 694 S.E.2d at 3. The improperly placed catheter eroded the newborn's heart wall and led to her death. *Id.* at 543, 694 S.E.2d at 3. In affirming summary judgment for the radiologist, our supreme court explained:

> Dr. Smith correctly contends the record fails to establish that a genuine question of material fact exists regarding whether his alleged failure to act within the standard of care could have been a proximate cause of Jamia's cardiac arrest and subsequent injuries. This is so because the record demonstrates that Dr. Goldstein was aware of the standard of care concerning UVC placement and he made an intentional and independent decision not to move the UVC based on numerous factors.

*Id.* at 548, 694 S.E.2d at 5. Thus, our supreme court concluded the plaintiffs failed to present any evidence that the radiologist's alleged breach of the standard of care in his reporting related to the catheter placement was a proximate cause of the infant's injuries. *Id.* at 549, 694 S.E.2d at 6.

But *Hoard* is not instructive to our review of proximate cause here in light of the various factors the *Hoard* physicians evaluated, notably Dr. Goldstein's judgment that "removing the UVC presented greater risk to Jamia than leaving it in place." *Id.* at 547, 694 S.E.2d at 5. In Pratt's case, Dr. Varaly was unaware that the March 2 CT chest scan showed acute rib fractures. Dr. Varaly testified that had he known the March 2 CT chest scan revealed nine non-displaced rib fractures, he would have worked to have Pratt admitted to a trauma hospital. Moreover, Wife's emergency medicine expert, Dr. Michael Chansky, testified emergency medicine doctors "depend on the radiologist to call us with the discrepancy." In sum, our review of the record reveals evidence supporting the jury's verdict as to Wife's survival action and on her loss of consortium claim. *See Austin*, 387 S.C. at 42, 691 S.E.2d at 145 ("[W]e reverse only when there is no evidence to support the ruling or when the ruling is governed by an error of law.").

Wife presented abundant evidence demonstrating how Pratt's condition deteriorated over the disputed two-day period. For example, Dr. Lupetin used Pratt's March 2 and 4 CT chest scans side-by-side to show the jury the concerning

changes in Pratt's lung anatomy. In just two days, Pratt's lung volume decreased and his bronchi walls were thickening in a way that suggested he was developing pneumonia. The March 4 image shows "the lung has collapsed."

Echoing Dr. Varaly's testimony that he would have sent Pratt to a trauma center had he known of the March 2 multiple rib fracture findings, Dr. Chansky testified about bilateral rib fracture complications:

> Yeah, bilateral contiguous rib fractures, even nondisplaced, that don't look too impressive on CAT scan is 100 percent admission to the hospital for aggressive respiratory therapy, watch for signs of pneumonia. Because once you get pneumonia, the rib fractures, even if they're small, it's very painful to cough. If you can't cough up the purulent sputum, the puss, the bacteria, the infection is going to become more severe and lead to death.
>
> So rib fractures are treated very aggressively—two or more rib fractures are treated very aggressively by trauma centers for the prevention of pneumonia and those complications by the things that I've described, walking, oxygen, chest therapy, incentive spirometry, Ventolin, inhalation therapy. They are preventative in forming pneumonia.

Wife's internal medicine and hospitalist expert Hiren Shah also addressed Pratt's medical records. Dr. Shah stated that at one point during this two-day period, Pratt's oxygen saturation reading fell as low as 80%,[6] and he required supplemental oxygen on March 4. This collection of vital sign readings—a low oxygen level combined with a high respiratory rate, body temperature, blood pressure, and white blood cell count—showed mucus was building up in Pratt's lungs, his body was attempting to mount a response to the burgeoning pneumonia infection, and one of his lungs was starting to collapse.

---

[6] Dr. Shah testified, "A normal oxygen level is well above 92 percent and you have to put it in the right picture. Normal is actually—what we commonly see is 95, 96, depending on how you want to define normal. It could be more than 92. Even 92, if someone has these other problems is bad so, [80-88 percent is] really low."

Daughter testified that while she was concerned about Pratt's condition on March 2, he was considerably worse on March 3. Her father was taking "very light, very shallow breaths" and there was blood in his urine. Wife testified Pratt was in considerable pain, he was unable to move, and his breathing was "very slow."

We find the record supports the circuit court's denial of Appellants' motions for directed verdict and JNOV on the survival and loss of consortium claims. Drs. Lupetin, Shah, and Chansky provided the causal connection between the delayed treatment of Pratt's acute rib injuries and his developing pneumonia. Accordingly, we affirm the circuit court as to these issues.

## B. Gross Negligence, Recklessness, Willfulness, Wantonness, and Punitive Damages

"'Recklessness implies the doing of a negligent act knowingly'; it is a 'conscious failure to exercise due care.'" *Berberich v. Jack*, 392 S.C. 278, 287, 709 S.E.2d 607, 612 (2011) (quoting *Yaun v. Baldridge*, 243 S.C. 414, 419, 134 S.E.2d 248, 251 (1964)). "[T]he terms 'willful' and 'wanton' when pled in a negligence case are synonymous with 'reckless,' and import a greater degree of culpability than mere negligence." *Id.* at 288, 709 S.E.2d at 612 (quoting *Marcum v. Bowden*, 372 S.C. 452, 458 n. 5, 643 S.E.2d 85, 88 n. 5 (2007)). Gross negligence, a lesser culpability standard, is a "relative term" meaning "the absence of care that is necessary under the circumstances" or "the failure to exercise slight care." *Jinks v. Richland County*, 355 S.C. 341, 345, 585 S.E.2d 281, 283 (2003)."

Multiple expert witnesses testified that the nine non-displaced rib fractures were acute injuries and that Dr. Gilleland improperly ignored the discrepancy between his and Virtual Radiology's initial interpretation of the chest CT scan. Because the initial chest CT scan showed multiple "acute buckle fractures," Virtual Radiology's interpretation was a "very significant" or "major" discrepancy that Dr. Gilleland could not leave uncommunicated. This error went beyond ordinary negligence because—according to Wife's experts—failing to call in the discrepancy under such circumstances violated hospital policy requiring a radiologist to call the ER if a chest image shows acute rib injuries or where "the radiologist is unsure of their acuity." In his deposition testimony presented at trial, Dr. Gilleland testified he "did not know" whether the rib injury shown on Pratt's March 2 chest CT was acute. By contrast, Dr. Gilleland's trial cross-examination testimony supports the jury's finding that he acted in a grossly negligent or reckless manner:

Q. According to your own testimony he had some cracked ribs. All right. Doctor, you knew that the E.R. doctor had ordered the CT on 3-2 in part to know specifically if there were any rib fractures present, correct?

A. Correct.

Q. You were aware when you saw that there were nine fractures that were not on the original until report, you knew that the E.R. doctor had already discharged the patient without having that knowledge, right?

A. Yes.

Q. And you knew that the E.R. doctor had made the decision to discharge him with the information of no rib fractures versus nine rib fractures.

A. There were no significant fractures.

. . . .

Q. You knew unless you looked, the ER doctor would not be aware of the mistake from zero acute fractures to whatever you want to call them?

A. Absolutely.

Q. You have been here for the testimony of Dr. Varaly where he clearly testified that—testimony was had he known about rib fractures, that would have been very clinically significant to him, right?

A. I think the question—I did I hear that. Yes. I heard that testimony.

Q. You heard him testify it was very clinically significant to him if he had known about nine cracked ribs he would have immediately transferred this patient to a trauma

center for observation under a trauma surgeon. That was his testimony, right?

A. That is his testimony. These are not those kinds of fractures. For that reason, it would be inappropriate.

Q. You know better than the ER doctor who has actually seen the patient, touched the patient, knew the patient best. You knew better than that doctor who has seen the patient, right?

A. Correct. The person who looks at the images is the one who most often determines the significance of the image findings.

. . . .

Q. Doctor, can we agree that if there were multiple cracked ribs present, as you talked about in your deposition, it would be improper for a radiologist to make a determination whether they were clinically significant versus the E.R. doctor letting him make the decision. Can we agree on that?

A. Yes. Qualified if you use the word cracked, then you are talking about a fracture type that actually has a visible line which nobody—your expert says they see a visible line in this case. It comes down to the pencil that is dented, somebody chewed on or it is fractures.

Q. Radiologists are not clinicians?

A. I actually do a procedure where I do history. It's hospital-based.

Q. Look at the testimony that has been given in your case by Dr. Parnes, who is the expert who is the witness that you have hired to come and can give testimony on your behalf. He testified that radiologists are not clinicians. So you disagree with your own witness?

Do you agree that it is not your job as a radiologist to look at the study and decide treatment decisions for the patient? Do you agree?

A. No. I think that is almost impossible. When I do not mention findings that I think[] is insignificant.

By definition, you wouldn't want to go down a certain treatment pattern. So whether it's missed or not, there is a clinical outcome. So everything I do every day is the decision of such findings.

Q. All right. So you disagree with your own witness. That is what you are telling us? Let's get to the next answer.

So you made [an argument] in this particular case that these fractures were not clinically significant, right?

A. I made an educated guess, yes.

Q. It's your testimony that on 3-2 that these were not significant? Simple yes or no, Doctor.

A. Yes. I would point out that this patient afterwards was not short of breath. There was at no point that he is having difficulty breathing.

. . . .

Q. So when Dr. Varaly who has reviewed all the medical records in this case and has reviewed deposition testimony as the defendant in this case and knows as much as anybody else does about this case, states that in his opinion the fractures that you found would have been clinically significant, except doesn't know what he is talking about?

A. Twist that.

Q. Yes or no[?]

[A]. I think the answer is no.  Because, he does not—that is an inaccurate statement.  He doesn't know what I know.  At that point in time, he does not have the information.

Q. He doesn't have the information because you didn't pick up the phone and tell him that.

A. Correct.  Tell him that his patient may have bone bruises, which as your own witness says, that it's improper to make assumptions.

We find Wife presented ample evidence that Dr. Gilleland acted with conscious indifference; thus, the circuit court properly denied Appellants' directed verdict and JNOV motions as to "gross negligence, recklessness, willfulness, and wantonness" and correctly submitted the question of punitive damages to the jury.  *See Welch*, 342 S.C. at 301, 536 S.E.2d at 419 ("The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton.").

Citing this court's decision in *Hamilton v. Regional Medical Center*, 440 S.C. 605, 891 S.E.2d 682 (Ct. App. 2024), *cert. denied* (May 1, 2024), Appellants contend the circuit court erroneously permitted Dr. Lupetin to testify that Dr. Gilleland's conduct was "reckless" because such a characterization provided an impermissible legal conclusion.  In *Hamilton*, the medical provider appellant argued the circuit court abused its discretion in *prohibiting* its expert witness from testifying as to whether Regional Medical Center was grossly negligent or negligent.  440 S.C. at 632, 891 S.E.2d at 696.  This court disagreed:

> The trial court did not abuse its discretion by preventing Regional from asking Hurley explicitly if Regional committed negligence or gross negligence.  Asking Hurley that question would have been asking her to form a legal conclusion, which would have been inadmissible. The fact that she is a nurse and not a lawyer or other legal expert does not make a difference; her answer could confuse the jury particularly because negligence could

have a broader meaning outside of the legal definition. Accordingly, we affirm the trial court's prohibiting Hurley from testifying if she believed Regional was negligent or grossly negligent.

*Id.* at 634, 891 S.E.2d at 698.

Here, counsel for Wife asked Dr. Lupetin, "Doctor, would you consider the conduct in this case to be reckless?" Dr. Lupetin answered, "Yes." While we agree such a question seeks an inadmissible legal conclusion in certain instances, we find no reversible error here. Dr. Lupetin's aggregate testimony addressed Dr. Gilleland's interpretation of the scan reading discrepancy and his conscious decision not to contact the emergency department regarding his findings. Additionally, Chief of Radiology Bruce Leonard's deposition testimony, portions of which were read into the record during Dr. Lupetin's cross-examination, provides further support for the jury's finding that Dr. Gilleland consciously disregarded a well-known policy among radiologists (as well as the standard of care) by taking it upon himself to consider the likely impact on Pratt's treatment course when determining how (or whether) to properly respond to the reading.

Specifically, Dr. Leonard agreed with the following statement: "So the policy of Piedmont Medical Center is that if there's evidence to suggest the rib fractures are acute, nine rib fractures are acute and they haven't been noticed on Virtual Radiology, that those acute, nine acute rib fractures need to be communicated either [sic] direct physician or leaving a message through the ER line." As noted above, Dr. Gilleland's own trial testimony emphasized his conscious choice not to communicate the scan reading discrepancy to the emergency department.[7] Thus, even if the circuit court erred in permitting the question asking whether Dr. Gilleland's conduct was "reckless," Appellants have failed to establish the required resulting prejudice. In reaching this result, we reference the evidence of conscious indifference presented through the expert witnesses as well as the jury's defense verdict on punitive damages. *See also Berberich*, 392 S.C. at 287, 709 S.E.2d at 612 (explaining the term "recklessness" includes "'the doing of a negligent act knowingly'; it is a 'conscious failure to exercise due care'").[8]

---

[7] Dr. Gilleland further admitted that in reviewing Pratt's scan, he "expected him to become a hospice patient."

[8] One other point relating to Appellants' argument on this issue bears reference. Appellants state they "experienced great difficulty in obtaining the trial transcript,

## II. New Trial Absolute

Appellants next argue the circuit court erred in denying their motion for a new trial absolute because the jury's verdict was ambiguous, strongly indicative of juror confusion, and grossly excessive. We disagree.

Appellate courts give great deference to circuit courts in this context because the trial court "possesses a better-informed view of the damages than" an appellate court since the trial court "heard the evidence and is more familiar with the evidentiary atmosphere at trial." *Vinson v. Hartley*, 324 S.C. 389, 405-06, 477 S.E.2d 715, 723 (Ct. App. 1996). "Accordingly, the decision to grant a new trial is

and there are numerous places where the transcript can be challenged as not being accurate or complete." By way of example, Appellants explain:

> One primary such place involves the inquiry by the Respondent's counsel to Dr. Lupetin as to whether the conduct of Dr. Gilleland was "reckless." The transcript does not show that a contemporaneous objection to that question was made by the Appellants' counsel or ruled upon by the trial court. The transcript gives no indication of even a side bar occurring. However, the issue arose again a short time later when the jury was out of the courtroom. The Appellants' counsel raised the objection as to the expert offering an opinion on recklessness. There is mention of a sidebar, and the trial court stated that the "objection's in" and further stated, "I noted the objection at the time it was made, but I still stand by my ruling, and I overruled your objection." The transcript does not reflect the sidebar or the court's ruling based on that sidebar, which is likely the result of errors in the transcription, but the later comments from the court should be sufficient to demonstrate that a contemporaneous objection was made and this issue is properly preserved for appellate review.

We agree with Appellants that this issue is properly preserved.

left to the sound discretion of the trial court and generally will not be disturbed on appeal." *Wright*, 372 S.C. at 36, 640 S.E.2d at 505.

We do not view the jury's verdicts as ambiguous or indicative of jury confusion. The verdict form included questions on the breach and proximate cause elements of Pratt's three negligence-based claims. The jury was then asked in a single question to state the amount of any damages, if any, awarded on each of the three claims. If the jury found any of the three claims lacking based on the damages element, the proper way to deliver that finding was to leave blank the damages line for that particular claim as was done here. In doing so, the jury conveyed that Appellants recklessly violated their legal duties and proximately caused some ($1,000,000) but not all ($5,000,000) of the harm Wife alleged in her complaint. The jury's awards are supported by the evidence presented at trial and consistent with the circuit court's jury instructions.

Likewise, we disagree that the jury's verdict is grossly excessive. "The decision to grant or deny a new trial absolute based on the excessiveness of a verdict rests in the sound discretion of the trial court and ordinarily will not be disturbed on appeal." *Welch*, 342 S.C. at 302, 536 S.E.2d at 420. "An abuse of discretion occurs if the trial court's findings are wholly unsupported by the evidence or the conclusions reached are controlled by an error of law." *Id.* "In deciding whether to assess error when a new trial motion is denied, this Court must consider the testimony and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* at 302-03, 536 S.E.2d at 420.

The evidence at trial showed Pratt and Wife were married for thirty-five years and raised three children together. For twenty-eight of their thirty-five years of marriage, Pratt and Wife were not only spouses but also business partners. Pratt, a former professional musician, spontaneously composed songs about his beloved wife and three children. Wife testified Pratt was "amazing"—a family leader known for being "[v]ery compassionate, strong, [and] loving" and that Wife and Pratt "relied on each other for everything." Wife concluded her testimony by describing her husband as "one of a kind" and irreplaceable because he was "too unique" and "too creative" with "too much compassion."

Despite Appellants' arguments to the contrary, we find Wife's losses began when she watched Pratt suffer through the ambulance ride back to Daughter's house. Once there, Pratt was not able to comfort or care for Wife because he lay in pain largely immobilized on the couch. The aid and advice Wife testified she was accustomed to receiving from her husband vanished when Pratt was rendered

unable to speak.  Wife had to assist Pratt in reaching the bathroom and, when he was unable to walk, she helped him urinate in a bottle; the contents of the bottle became bloody during these two days.  Wife watched on helplessly as her husband was unable to eat and his breathing became more difficult.

Appellants point to no evidence in the record to support their argument that the aid, comfort, and support Pratt was unable to provide Wife while she cared for him on the sofa would have been equally lacking had he been in a hospital setting receiving aggressive therapy to reduce his pain and improve his shallow breathing.  Similarly, their insistence that Wife's loss of consortium claim should be limited to the two-day period between Pratt's PMC discharge and his admission and diagnosis at CMC-Pineville is not supported in the record.  Instead, the evidence shows Appellants' negligence deprived Pratt of necessary and immediate in-patient care.  Even after Pratt was properly diagnosed and began treatment within CMC trauma facilities, his drastic decline in health continued to negatively affect his ability to carry on the loving relationship he and Wife enjoyed throughout their thirty-five-year marriage.  The jury was not required to restrict its deliberation on this claim to the identified forty-eight-hour period.

Appellants further argue a $640,000 loss of consortium award is just too much under these circumstances.  However, valuing the intangible losses that comprise a loss of consortium claim is a difficult task for the factfinder—here, the jury— that had the chance to directly hear the evidence and observe the witnesses.  We see nothing in this award that is out of bounds when compared with other awards in South Carolina jurisprudence.  *See, e.g.*, *Keene v. CNA Holdings, LLC*, 426 S.C. 357, 384-87, 827 S.E.2d 183, 198-99 (Ct. App. 2019), *aff'd*, 436 S.C. 1, 870 S.E.2d 156 (2021) (affirming circuit court's order finding $5,000,000 loss of consortium award was supported by the evidence—such as wife's testimony addressing forty-seven years of marriage to her best friend—and was not excessive); *Scott v. Porter*, 340 S.C. 158, 170-71, 530 S.E.2d 389, 395-96 (Ct. App. 2000) (affirming award of $600,000 in actual damages on survival claim for a child whose conscious pain and suffering covered less than a two-day period where plaintiff's evidence included only $85 in medical costs but significant circumstantial evidence of child's pain and suffering).

Finally, for such an award to be declared "grossly excessive," Appellants must show the circumstances in which it was entered suggest the jury was motivated by passion or prejudice.  *See Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 27, 602 S.E.2d 772, 781 (2004) ("When considering a motion for a new trial based on the inadequacy or excessiveness of the jury's verdict, the trial court must distinguish

between awards that are merely unduly liberal or conservative and awards that are actuated by passion, caprice, or prejudice."). We see nothing in the trial transcript to support such a conclusion. In fact, the verdicts here demonstrate that even after finding Appellants were reckless/grossly negligent, the jury declined to award punitive damages. For these reasons, we affirm the circuit court's denial of Appellant's motion for a new trial absolute.

### III.    Allocation of Fault

Appellants next challenge both the circuit court's requirement that the jury allocate fault as well as the allocation of 10% of the fault to Rock Hill Radiology. We find no error by the circuit court.

As discussed in Section I.A, *supra*, Appellants raised no complaint before the circuit court with respect to the verdict form generally. Nor did they specifically challenge the verdict form's fault allocation section. We note Appellants may have elected not to raise an objection here because they had agreed earlier in the trial that Wife was permitted to argue Rock Hill Radiology was liable for Virtual Radiology's error. The circuit court acknowledged this concession and subsequently instructed the jury it could find liability against any (or none) of the three defendants listed on the verdict form. In our view, this concession fatally undermines Appellants' argument that faulting Rock Hill Radiology for Virtual Radiology's error impermissibly extends beyond the claims Wife pled in her complaint. Even if the complaint did not spell out Rock Hill Radiology's liability for this error in great detail, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 15(b), SCRCP.

Moreover, we note Appellants' current objection to the verdict form's fault allocation question must fail on the merits. Wife produced evidence from which a jury could find Rock Hill Radiology at fault for Virtual Radiology's conduct. Dr. Gilleland testified Rock Hill Radiology had an exclusive radiology services contract with PMC and, seeking to avoid late night work, made the choice to bring in Virtual Radiology to read all PMC radiological images during the hours of 11 p.m. to 7 a.m. Expert testimony established Virtual Radiology's initial read of Pratt's CT chest scan was grossly inaccurate in that it missed an acute abnormality—i.e., the nine non-displaced rib fractures. Based on the way the evidence was presented, the jury was free to evaluate whether Rock Hill Radiology was responsible—or partially responsible—for Virtual Radiology's misreading of the March 2 scan.

In the 2005 South Carolina Contribution Among Joint Tortfeasors Act (the Act),[9] our legislature abrogated pure joint and several liability for tortfeasors less than 50% at fault. The Act "directs the fact-finder to apportion one-hundred percent of the fault between the plaintiff and 'each defendant whose actions are the proximate cause of the indivisible injury.'" *Smith v. Tiffany*, 419 S.C. 548, 553, 799 S.E.2d 479, 481 (2017) (quoting § 15-38-15(C)(3)). Under the Act, the apportionment of fault is determined as follows:

> (A) In an action to recover damages resulting from personal injury, wrongful death, or damage to property or to recover damages for economic loss or for noneconomic loss such as mental distress, loss of enjoyment, pain, suffering, loss of reputation, or loss of companionship resulting from tortious conduct, if indivisible damages are determined to be proximately caused by more than one defendant, joint and several liability does not apply to any defendant whose conduct is determined to be less than fifty percent of the total fault for the indivisible damages as compared with the total of: (i) the fault of all the defendants; and (ii) the fault (comparative negligence), if any, of plaintiff. A defendant whose conduct is determined to be less than fifty percent of the total fault shall only be liable for that percentage of the indivisible damages determined by the jury or trier of fact.

> (B) Apportionment of percentages of fault among defendants is to be determined as specified in subsection (C).

> (C) The jury, or the court if there is no jury, shall:

>> (1) specify the amount of damages;

>> (2) determine the percentage of fault, if any, of plaintiff and the amount of recoverable damages

---

[9] S.C. Code Ann. §§ 15-38-10 to -70 (2005 & Supp. 2024).

under applicable rules concerning "comparative negligence"; and

(3) upon a motion by at least one defendant, where there is a verdict under items (1) and (2) above for damages against two or more defendants for the same indivisible injury, death, or damage to property, specify in a separate verdict under the procedures described at subitem (b) below the percentage of liability that proximately caused the indivisible injury, death, damage to property, or economic loss from tortious conduct, as determined by item (1) above, that is attributable to each defendant whose actions are a proximate cause of the indivisible injury, death, or damage to property. In determining the percentage attributable to each defendant, any fault of the plaintiff, as determined by item (2) above, will be included so that the total of the percentages of fault attributed to the plaintiff and to the defendants must be one hundred percent. In calculating the percentage of fault attributable to each defendant, inclusion of any percentage of fault of the plaintiff (as determined in item (2) above) shall not reduce the amount of plaintiff's recoverable damages (as determined under item (2) above).

(a) For this purpose, the court may determine that two or more persons are to be treated as a single party. Such treatment must be used where two or more defendants acted in concert or where, by reason of agency, employment, or other legal relationship, a defendant is vicariously responsible for the conduct of another defendant.

(b) After the initial verdict awarding damages is entered and before the special verdict on percentages of liability is rendered, the parties shall be allowed oral argument, with the length of such argument subject to the discretion of the trial

judge, on the determination of the percentage attributable to each defendant. However, no additional evidence shall be allowed.

§ 15-38-15 (A)-(C).

We find Appellants' reliance on § 15-38-15(C)(3)(a) is misplaced in this case. First, this provision requires a court to treat two defendants as one only when they act "in concert" or where one of the defendants is responsible solely based on its vicarious liability for the other. *Id.* Because there is evidence in the record pertaining to Rock Hill Radiology's liability for Virtual Radiology's error in addition to Dr. Gilleland's separate errors, § 15-38-15(C)(3)(a) is likely inapplicable. Perhaps more significantly, because the jury found Rock Hill Radiology and Dr. Gilleland were reckless or grossly negligent, none of the provisions of § 15-38-15 apply. *See* § 15-38-15(F) ("This section does not apply to a defendant whose conduct is determined to be wilful, wanton, reckless, [or] grossly negligent . . . ."). Accordingly, we find the circuit court did not err in requiring the jury to allocate fault or in upholding the 10% allocation of fault to Rock Hill Radiology.

## IV.    Noneconomic Damages Cap

Appellants next argue the circuit court erred in failing to reduce the verdict based on a noneconomic damages cap of $431,865. We disagree.

The South Carolina Noneconomic Damages Award Act of 2005 places the following limits on noneconomic damages:

> (A) In an action on a medical malpractice claim when final judgment is rendered against a single health care provider, the limit of civil liability for noneconomic damages of the health care provider is limited to an amount not to exceed three hundred fifty thousand dollars for each claimant, regardless of the number of separate causes of action on which the claim is based, except as provided in subsection (E).
>
> (B) In an action on a medical malpractice claim when final judgment is rendered against a single health care institution, the limit of civil liability for noneconomic

damages is limited to an amount not to exceed three hundred fifty thousand dollars for each claimant, regardless of the number of separate causes of action on which the claim is based, except as provided in subsection (E).

(C) In an action on a medical malpractice claim when final judgment is rendered against more than one health care institution, or more than one health care provider, or any combination thereof, the limit of civil liability for noneconomic damages for each health care institution and each health care provider is limited to an amount not to exceed three hundred fifty thousand dollars for each claimant, and the limit of civil liability for noneconomic damages for all health care institutions and health care providers is limited to an amount not to exceed one million fifty thousand dollars for each claimant, except as provided in subsection (E).

(D)(1) The provisions of this section do not limit the amount of compensation for economic damages suffered by each claimant in a medical malpractice claim.

(2) The provisions of this section do not limit the amount of punitive damages in cases where the plaintiff is able to prove an entitlement to an award of punitive damages as required by law.

(E) The limitations for noneconomic damages rendered against any health care provider or health care institution do not apply if the jury or court determines that the defendant was grossly negligent, wilful, wanton, or reckless, and such conduct was the proximate cause of the claimant's noneconomic damages, or if the defendant has engaged in fraud or misrepresentation related to the claim, or if the defendant altered or destroyed medical records with the purpose of avoiding a claim or liability to the claimant.

S.C. Code Ann. § 15-32-220 (A)-(E) (2005 & Supp. 2024).

Appellants note the circuit court "presumably refused to apply the non-economic damages cap based on the jury's finding that the Appellants 'were reckless or grossly negligent in their care and treatment of [Pratt].'" On appeal, Appellants maintain that because they "were entitled to a JNOV on the issue of recklessness or gross negligence, they are also entitled to a cap of $431,865 on the noneconomic damages." However, for the reasons discussed in Section I.B, *supra*, we find the evidence more than supports the jury's finding of recklessness or gross negligence. And, by its plain language, § 15-32-220's damages limitation provisions do not apply to such an enhanced level of culpability.

## V.    Setoff

Finally, Appellants contend the circuit court erred in allowing Wife to alter an earlier proposed allocation of settlement funds following the return of the jury's verdict. Stated differently, Appellants argue the circuit court should have setoff the $250,000 Amisub settlement based on the allocation Wife announced early in the trial when the settlement was initially placed on the record. We disagree.

The "jurisdiction of the court to set off one judgment against another is equitable in its nature, and should be exercised so as to do justice between parties." *Riley v. Ford Motor Co.*, 414 S.C. 185, 195, 777 S.E.2d 824, 830 (2015) (quoting *Rookard v. Atlanta & Charlotte Air Line Ry. Co.*, 89 S.C. 371, 71 S.E. 992, 995 (1911)). "A non-settling defendant is entitled to credit for the amount paid by another defendant who settles for the same cause of action." *Rutland v. S.C. Dep't of Transp.*, 400 S.C. 209, 216, 734 S.E.2d 142, 145 (2012). "The reason for allowing such a credit is to prevent an injured person from obtaining a second recovery of that part of the amount of damages sustained which has already been paid to him." *Welch*, 342 S.C. at 312, 536 S.E.2d at 425; "In other words, there can be only one satisfaction for an injury or wrong." *Id*.

In 1988, these equitable principles were codified through the Uniform Contribution Among Tortfeasors Act. §§ 15-38-10 to -70. Section 15-38-50 provides:

> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

(1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

(2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

When a prior settlement involves compensation for the same injury, the nonsettling defendant's right to a setoff arises by operation of law under § 15-38-50. *Ellis v. Oliver*, 335 S.C. 106, 112, 515 S.E.2d 268, 271 (Ct. App. 1999). "However, our case law favors a plaintiff's ability to apportion settlement proceeds 'in the manner most advantageous to it.'" *Jolly v. Gen. Elec. Co.*, 435 S.C. 607, 666-67, 869 S.E.2d 819, 851 (Ct. App. 2021) (quoting *Riley*, 414 S.C. at 197, 777 S.E.2d at 831), *aff'd Jolly v. Fisher Controls Int'l, LLC*, 443 S.C. 511, 905 S.E.2d 380 (2024).

These codified equitable principles reflect "the proper balance between preventing double-recovery and South Carolina's 'strong public policy favoring the settlement of disputes.'" *Riley*, 414 S.C. at 196, 777 S.E.2d at 830 (quoting *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 346, 698 S.E.2d 559, 560 (2010)). In *Riley*, our supreme court explained:

A plaintiff who enters into a settlement with a defendant gains a position of control and acquires leverage in relation to a nonsettling defendant. This posture is reflected in the plaintiff's ability to apportion the settlement proceeds in the manner most advantageous to it. Settlements are not designed to benefit nonsettling third parties. They are instead created by the settling parties in the interests of these parties. If the position of a nonsettling party is worsened by the terms of a settlement, this is a consequence of the refusal to settle. A defendant who fails to bargain is not rewarded with the privilege of fashioning and ultimately extracting a benefit from the decisions of those who do.

*Id.* at 197, 777 S.E.2d at 831 (quoting *Lard v. AM/FM Ohio*, 901 N.E.2d 1006, 1019 (Ill. App. 2009)).

After trial, the circuit court entered a $1,000,000 judgment for Wife on February 10, 2020. By form order filed May 4, 2020, the court granted "a set off of Plaintiff's claims in the amount of $83,333.33 each for the survival claim and the loss of consortium claim from the time the judgment was rendered on February 10th, 2020."

The parties do not dispute that Wife's claims against Amisub were the same as those asserted against Appellants. There is likewise no dispute that the injuries claimed against Amisub were the same injuries claimed against Appellants. In short, while the parties agree that Appellants are entitled by statute and in equity to some setoff, they disagree as to the amounts the circuit court could reasonably set off against Wife's three causes of action.

Although this discussion is absent from the trial transcript,[10] Wife properly conceded in her memorandum in opposition to Appellants' post-trial motions that when the settlement was announced mid-trial, "the parties suggested the settlement funds might be allocated with 90% apportioned to the loss of consortium claim and 5% allocated respectively to the survival and wrongful death claims." At that stage of the trial, the circuit court responded, "We will have an approval hearing in front of me sometime in the next few days." This was a logical and appropriate response because, as our supreme court recently explained, such a settlement allocation hearing "may take place only after the jury verdict because until then there is no issue to resolve." *Jolly*, 443 S.C. at 534, 905 S.E.2d at 392. "Thus, while the setoff judge must consider such an agreed-upon allocation, the ultimate 'reasonable allocation' can be determined only after the setoff judge has heard the arguments of the non-settling defendant following the jury verdict." *Id.*

In her petition for approval of the Amisub settlement, Wife sought a different allocation of the $250,000 among the three claims than was suggested to the court and the parties mid-trial. Wife proposed an allocation of one-third of the settlement proceeds to each claim, seeking to reduce the setoff against the loss of consortium claim from $225,000 to $83,333.33, increase the setoff against the survival claim from $12,500 to $83,333.33, and increase the setoff against the wrongful death claim from $12,500 to $83,333.33. The circuit court acknowledged the parties' arguments—including the statements made when the

---

[10] Three pages are missing at this point in the transcript. *See* FN8, *supra*.

settlement was initially placed on the record—and applied the setoffs in the manner Wife requested in her post-trial settlement approval petition.

Appellants contend the circuit court erred in failing to "give effect to the settling parties' agreement" and that it was "inherently unfair and inequitable" for the court to allow Wife to finalize the allocation only after the verdict was returned and after she knew the result from trial. But our review of the record (and our supreme court's *Jolly* opinion) convinces us that the circuit court properly exercised its discretion in granting setoffs of $83,333.33 (each) against the survival and loss of consortium claims. *See, e.g.*, *Jolly*, 443 S.C. at 534, 905 S.E.2d at 392 ("Therefore, if there is an agreement between the settling parties allocating settlement funds, or a ruling by a judge approving such a settlement, or even—as here—a unilateral, internal allocation by the plaintiff, the setoff judge may accept that allocation only if the judge determines it is reasonable."). The circuit court could accept a proposed allocation of the settlement proceeds as reasonable only after the jury's verdict was returned. We affirm the circuit court's well-reasoned consideration of the appropriate setoffs and its allocation of the settlement funds.

## Conclusion

The circuit court's orders denying Appellants' motions to alter or amend; denying the post-trial motions for JNOV and/or a new trial absolute; requiring the jury to allocate fault; declining to reduce the verdict pursuant to the statutory noneconomic damages caps; and granting Wife's requested setoff allocation are

**AFFIRMED.**

**THOMAS, J., and VERDIN, A.J., concur.**